## H. C. DAVIS v. STATE.

No. A-1660.  Opinion Filed October 11, 1913.

(135 Pac. 438.)

1.  **APPEAL—Discretionary Ruling—Continuance.** The granting or refusal of a continuance in a criminal case is largely a matter within the discretion of the trial court, and this court will not reverse a judgment on a matter which rests in the sound discretion of the court, unless it is shown that there has been an abuse of discretion.

2.  **CONTINUANCE—Application—Sufficiency.** Where a defendant seeks a continuance upon the ground that he has used· due diligence to secure the attendance of an absent witness, he must set out fully in his application the facts showing diligence.

3.  **APPEAL—Issues of Fact.** When issues of fact are determined by the jury upon evidence which is sufficient, even though it may be capable of diverse and opposing inferences, this court has no more right than the trial court to substitute its own judgment in the place of that of the jury, or to usurp its legitimate functions.

*Appeal from District Court, Stephens County;*
*Frank M. Bailey, Judge.*

H. C. Davis was convicted of larceny of a hog, and appeals. Affirmed.

On May 25, 1911, there was filed in the district court of Stephens county an information, charging the defendant with the theft in Stephens county, on or about the 5th day of March, of a hog, the property of J. Paschal. The case was called for trial on the 8th day of November, and the defendant filed a motion for a continuance, which was overruled. His trial resulted in a verdict of guilty, and his punishment was assessed at confinement in the penitentiary for the term of one year and one day.

J. Paschal was the first witness for the state. He testified that he lived 250 or 300 yards from the defendant; that in March, 1911, he lost a large red sow, weighing about 300 pounds. The sow had a bobbed tail, a slit in the right ear, and hair of a cherry red color, and was running at large on the range near the defendant's house; that he had the sow about two years and

a half; that on Saturday the 5th day of March, 1911, the sow disappeared; that he made a diligent search the next day, but failed to find her; that a neighbor out hunting found the head and hide of a hog a mile and a half east of witness' residence. Witness went there, and identified the head and hide as belonging to the sow which he had lost. That witness then got an officer and a search warrant, and started over the neighborhood searching for the hog meat. On the morning of the 8th of March he, with a searching party, went to the defendant's house. The defendant was not at home, and his wife objected to them making any search. Witness then went and found the defendant in a field, and asked him whether or not he had any meat at his place, and he said he did not have any, and asked witness to go across the creek and search other houses that morning and come back to his place that evening. The defendant asked for the search warrant, and one Mr. Marlow read it to him, and then the defendant said: "All right; I haven't any meat here except a piece of bacon." The defendant said, "Come around on the south side of the house and search." Then Mr. Marlow said he would go on the north side and the defendant objected, and Mr. Marlow went around on the north side and found a box of meat under the house and pulled it out; the meat was fresh, and had been butchered about 48 hours; it consisted of middlings, shoulders, and hams, which had been salted. The hair had not been scraped off, but the hog had been skinned. Several pieces of the hide were left on, and witness identified this as the same color of hair as that on the hog which he had lost. When the meat was found the defendant said that he had had it ten days, and that he had gotten it at Dick and Ide Norman's. Witness examined the horse tracks and the shoe tracks where the head and hide of the hog were found, and was present when a comparison of the shoe tracks was made with a pair of shoes of the defendant, and testified that he saw the defendant wearing these shoes before this hog was killed.

Tom Harris was the next witness for the state. He testified that he was acquainted with the defendant and with J. Paschal, and had seen Mr. Paschal's red sow during the month

of March; that he was out hunting some cows, and had a hound with him; that the hound ran across the head and hide of the hog; that there was a slit in the ear similar to the mark that Paschal placed on his hogs.

Mill McHenry testified that one or two weeks before the meat had been found at the defendant's house he was there, and at that time he noticed a big, red sow belonging to J. Paschal about the place, and the defendant said to him then: "If Paschal don't take care of that hog, I am going to have some fresh meat."

Jim Norman testified that about a week after the defendant gave bond he came to witness' house and told witness that he had killed J. Paschal's hog with a shotgun, and that he came there to get witness to help him out of the trouble; that he is a brother-in-law of the defendant; that they were not good friends.

George Marlow testified: That as a deputy constable he had a search warrant and searched the defendant's house and a number of other houses at that time; and when he told the defendant his business, and the defendant asked for his papers, and witness showed the papers to him, the defendant said: "All right, gentlemen; I have no fresh meat here." That he found a box under the floor filled with five pieces of fresh meat, and he asked defendant where he got it, and the defendant said he got it at Dick Norman's the Friday before. That the meat had been skinned and salted, but there was a piece of the hide which had hair of a reddish color. That he went to the place where the head and hide of the hog had been found, and made an examination of the horse tracks there, and noticed that the tracks were peculiar in this: That the left fore foot of one of the horses made a peculiar track showing that a piece had been broken out of the hoof. That he examined the horses about an hour later, and the tracks made corresponded with the tracks which he had just measured. That he made an examination of the men tracks at that place, and noticed a peculiarly broken place in the tracks caused by the shoe which had been worn out through the sole, and these tracks corresponded with the tracks made by the defendant's shoes.

J. F. Brewer testified that he was present when the comparison was made of men tracks, and that there was absolutely no difference in the tracks made by the defendant's shoes and the tracks which had been made around the place where the hide and head of the hog was found.

The testimony of Mr. Sellars and Mr. Manard was substantially to the same effect.

The defendant as a witness in his own behalf testified that Jim Norman came to his house a week before the hog was missing, and told him that he was going to kill a hog and asked him if he would take part of it, and the defendant told him he would; that on Sunday evening Norman came to the defendant's house and said: "I found that hog and killed it, come and go with me and we will get it." And he said, "Jim, I am pretty tired to go down there now," and Norman said, "It's down here about a quarter of a mile." That then he took an axe and scales and went with Norman. That they weighed the meat, and it weighed about 120 pounds. That he said to Norman: "Jim, I haven't any money to pay you, and you see Dick Norman and tell him that I said to pay you for the meat." That Dick Norman at that time owed him some money. That he then took the meat home and salted it. That Jim Norman told him that this hog belonged to Dick Norman, and he paid eight cents a pound for the meat. He further testified that he was not at Jim Norman's, and did not have the conversation which Jim Norman testified to.

Mrs. Nannie Davis testified that she was present when Jim Norman came to their place and offered to sell some meat to Mr. Davis.

C. Henry Williamson testified for the defendant that Jim Norman bought a red sow from Henry Spencer and paid him $25 for it. On cross-examination witness testified that Norman bought this hog seven or eight days after the defendant's house had been searched and the meat found there; that witness and Dick Norman made bail for the defendant; that Spencer said he did not care to sell the sow, and that he would charge $25 for her, and Jim Norman said: "I will give it, I do not care any-

thing about the hog, I just have to have it."

Henry Spencer testified that about the middle of March he sold a red sow to Jim Norman for $25, and Jim Norman said at that time "that he did not want the hog, but that he had particular use for it."

Dick Norman testified that in March, 1911, he paid some money to Jim Norman for the defendant; that Jim Norman claimed that the defendant owed him for 108 pounds of meat at eight cents a pound, and witness paid Jim Norman $9.60.

The state on rebuttal introduced Will Morris, who testified that he was at the home of the defendant when the search was made and the meat found, and heard the defendant say that he got the meat from Dick Norman, and that the meat was on the work bench at Dick Norman's home at the time he got it.

*Womack & Brown* and *Stuart, Cruce & Gilbert,* for plaintiff in error.

*Charles West,* Atty. Gen., and *Smith C. Matson,* Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). Three assignments of error are relied on for a reversal of the judgment: First, that the court erred in overruling the motion of the defendant for a continuance on account of the absence of a material witness; second, that the evidence is insufficient to support the verdict; third, that the court erred in its instructions to the jury. We shall determine these questions in the order named.

The application for continuance is supported by two affidavits. The first sets forth:

"That he is unable to proceed to trial at this time for want of material evidence, to wit, the evidence of one Jim Isam, who is a material witness in this case, and defendant has used due diligence to obtain the evidence. That this defendant only learned on November 7th that Jim Isam is at present a resident of Oklahoma, and is somewhere in the eastern part of the state, but his exact whereabouts is to this defendant unknown. That this witness has not been subpoenaed to be present at the trial of this case in this court for the reason, as above stated,

this affiant was not apprised and did not know what this witness would testify, but that defendant expects to have the evidence of said Jim Isam by the next term of this court. Defendant expects to prove the following facts by said witness, to wit: That Jim Norman told him, Jim Isam, that he sold Bud Davis the meat that was taken away from Bud's house, and further that Jim Norman came to Jim Isam's house, on Bud Farris' place, and asked him to go look at a hog hide, and that he went and saw the hide. That affiant believes the same to be true, and that said evidence, so far as the defendant knows, cannot be furnished by any other witness."

The second states:

"That he is unable to proceed to trial at this time for the want of material evidence, to wit, the witness John Patterson, who is a material witness in this case; that defendant has used due diligence to procure this witness, that a subpoena was issued for said witness, but said witness has not been served, and defendant is informed that this witness resides in Stephens county, Okla. That the defendant expects to prove the following facts by said witness: That Jim Norman told him that he sold Bud Davis the meat that was taken away from Bud's house, and after that Jim Norman came to him and asked him to go and look at a hog hide. That he went and saw the hide, and that affiant believes the same to be true. That said evidence, so far as the defendant knows, cannot be furnished by any other witness. This application is not made for delay, but that justice may be done, and asks that this cause be continued until the next term of this court."

The mere statement of a defendant that he has used due diligence to secure the attendance of an absent witness is not sufficient to show diligence. He must set out fully in his application for continuance the facts which constitute such diligence. The delay of the defendant, as shown by the record, in procuring process for his witnesses amounts almost to indifference. A defendant should not wait until just before his trial before he begins to get ready for trial, but must exercise diligence in procuring process for his witnesses.

The rule is well settled that the granting or refusal of a continuance in a criminal case is largely a matter of discretion of the trial court, and this court will not reverse a trial court on a decision of a matter which rests in the sound discretion

of the court, unless it is shown that. there has been an abuse of discretion.

We think the application for a continuance was properly denied.

Looking at the case upon the merits, it is impossible to find any ground for the interference of this court. The questions in the case were for the jury, and the verdict is well supported by the evidence. It is the province of the jury to determine questions of fact depending upon conflicting evidence, and to declare by their verdict what the truth is. It is no more the province of this court than of the trial court to determine controverted questions of fact arising upon conflicting evidence. Neither can lawfully usurp the appropriate functions of the jury, and neither can substitute its own judgment for that of the jury, where the facts are reasonably capable of diverse and opposing inferences.

"Where the evidence is circumstantial, and the circumstances are such as to reasonably justify an inference of guilt, the weight and value of such testimony are exclusively for the jury. It is only where the evidence obviously does not warrant the inference of guilt that the court will interfere. Otherwise the weight of circumstantial evidence, and the inference to be drawn from it in almost every case, would finally be determined by the appellate court. We think a verdict of a jury based upon circumstantial evidence comes to us as any other verdict; and, unless we can say that the inference of guilt drawn from the evidence was wholly unwarranted, we cannot interfere." (*Wainscott v. State*, 8 Okla. Cr. 590, 129 Pac. 655.)

We do not think there is any serious ground for the contention that this is a case which would justify this court in interfering with the facts as determined by the jury.

The record in this case fails to show that any objections were made or exceptions taken to the instructions given by the trial court. And no instructions were requested by the defendant to be given. The objections argued in the brief are without merit. The charge of the court was exceedingly fair, and every right of the defendant was carefully guarded.

Having considered all objections to the judgment presented in argument by counsel, we discover no ground for disturbing the judgment. It is therefore affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.