## JOHN·ETTER v. STATE.

### No. A-2012.    Opinion Filed December 5, 1914.

### (144 Pac. 560.)

1. **HOMICIDE — Appeal—Conclusiveness of Verdict—Sufficiency of Evidence.** (a) When the evidence introduced on behalf of the state is such that a legitimate deduction of guilt can be drawn therefrom, this court will not reverse a conviction on the ground that the verdict is contrary to the evidence or weight thereof.

   (b) For ·facts sufficient to sustain a conviction for murder and which amply warrant the conclusions of the jury, see opinion.

2. **PARTIES TO OFFENSES—''Principal.''** All persons concerned in the commission of a crime are guilty as principals, under our statutes.

3. **VENUE—Change of Venue—Second Application.** (a) When an application for change of venue is filed and properly overruled by the trial court, it is within the discretion of that court to hear and determine additional applications based upon the same grounds and supported only by additional compurgators.

   (b) When a person who is charged with crime desires to make a second effort to secure a change of venue, the application should contain a statement of material facts in addition to those already submitted to the court which upon the face of the same would entitle him to the relief sought.

4. **SAME.** For proceedings which are held insufficient to entitle the petitioner to a change of venue on a second application, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Rogers County;*
*T. L. Brown, Judge.*

John Etter was convicted of murder, and appeals. Affirmed.

*J. R. Charlton, Thompson & Smith,* and *S. H. Sornberger,* for plaintiff in error.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

ARMSTRONG, P. J. The plaintiff in error, John Etter, was convicted at the December, 1912, term of the district court of Rogers county on a charge of murder, and his punishment fixed at imprisonment in the state penitentiary for life.

It appears that the homicide out of which this conviction grew occurred on the 20th day of September, 1912, near Collinsville, Rogers county, Okla. About the 1st of September, 1912, the plaintiff in error got a barrel of whisky at Joplin, Mo., and had it brought to Oklahoma by George Goode. Goode lived some six miles north of Collinsville, in Rogers county. The whisky was brought to his home and placed in a smokehouse. On the 20th day of September the plaintiff in error, Etter, arranged with a liveryman, named Miller, at Collinsville, for a team and closed carriage to go out to Goode's place. The liveryman furnished a driver. Etter directed the liveryman to send the team around to a certain barber shop in Collinsville. At the barber shop one Triplett, who was jointly charged with the plaintiff in error in this case, and who was convicted upon a separate trial prior to the conviction of this plaintiff in error, got into the carriage and was driven by direction of Etter to his home two or three miles from Collinsville. Etter rode a horse to his home, and then got into the carriage, which was driven to Goode's place by a circuitous route. At the home of Etter two empty kegs were placed in the carriage. On arriving at Goode's place, the kegs were filled with whisky and placed in the carriage, and after dark the driver, plaintiff in error, and Triplett were returning along the road toward Collinsville. When they reached a place near the home of one Finley, they were stopped by the sheriff and a deputy named Starr. The sheriff ordered the driver to stop the team, saying he wanted to see what was in the vehicle. The driver testified to what occurred immediately thereafter; his testimony being as follows:

"Q. What conversation did you and Etter have after you left George Goode's? A. Me and Etter never had none. The only thing, when we were going through the bottom, laughing and joking about a big, mad bull in the bottom, and that I had better watch out for him. Q. Tell just what was said. A. That is the only conversation I heard between them. Q. State just what Etter said, as well as you can remember. A. Well, he said, 'There is a big, mad bull or wild bull,' or something like that, 'in the bottom here,' and said I had better watch out for him. I never really paid any attention to it. I thought they

were just joking me about it. Q. Is there any house along that road through the bottom? A. I never saw any. Q. Where did you strike the first house after you left George Goode's place? A. The first house I saw was out there on top of the hill. Q. After you hit the main north and south road? A. Yes, sir. Well, no, sir; going east and west before we turned. Q. How far before you come to the main north and south road? A. Sets right on top of this hill there; about a quarter, I reckon. Q. Then, after you turned south towards Collinsville, what occurred? A. We drove on south until we met Mr. Sanders and Mr. Starr—I presume that is who they were, but I didn't know them at the time—and they demanded me to stop the team. Q. Who told you to stop the team? A. Mr. Sanders. Q. What did he say? A. He said: 'Stop that team. I want to see what there is in that wagon.' Or something like that. Q. What did you do then? A. I jerked the horses up and stopped them. Q. What did Mr. Sanders do then? A. Took the horses by the bits. Q. Which horse did he take by the bits? A. The one on the left hand side. Q. What did the other man do with him? A. Walked around the other side of the hack, and went to the back end of the hack. Q. Then what occurred? A. I heard somebody say, 'You fellows go down the road,' or 'You go down the road.' Q. Know who said that? A. No, sir. I don't know who said that, and Triplett come by with this man in front of him. Q. Where was Mr. Starr at that time? A. He was in front of Mr. Triplett, going down the road. Q. Did he have a gun? A. Yes, sir. Q. Where was it? A. Mr. Starr? I don't know whether Mr. Starr had any gun or not. Q. Did Triplett have a gun? A. Yes, sir. Triplett had a gun. Q. Where was he holding the gun? A. Holding it on Mr. Starr, about like that. Q. Where was Mr. Starr with reference to him? A. Right in front of him. Q. Just stand up here behind me and show the jury, as near as you can, how Triplett was holding that gun on Mr. Starr. A. Something like that [indicating]. Q. Holding it almost in the center of the back? A. Yes, sir. Q. How far did they go down the road? A. I presume 20 or 30 steps. Q. After they passed there, when did you next see the defendant, John Etter? A. After they passed the hack? Q. Yes, sir. A. I saw him when he walked out on the other side. Q. How far was he behind Jack Triplett? A. I don't know. I turned around, and Etter was standing there. Q. Then what occurred? A. Mr. Sanders asked him—he said, 'Is that you, John?' He said, 'Yes, is that you, Ed?' He said, 'Yes.' And he said: 'Come over here. I don't want to hurt you.'

That is the way he spoke. That's about all the conversation I heard. Q. Then what occurred? A. About that time the shot was fired down the road, and Triplett come running back, and he and Mr. Sanders began to shooting. Q. Did you see Etter any more after that? A. Yes, sir. I saw him as I left there. Q. When did you leave? A. About the time the horse fell. Q. You say the shot was fired down the road. How far was that? A. Down the road? Q. Yes. A. About 20 or 30 steps, I reckon. Q. Do you know who fired that shot? A. I could not swear exactly who fired it. Q. Did you see the flash? A. Yes, sir. Q. Which way did it go? A. South. Q. About how far above the ground? A. Oh, it seemed to be about four or four and one-half feet. Q. And you saw Jack Triplett immediately after that running up towards the horses with a gun in his hands? A. Yes, sir. Q. Did you see this man George Starr any more? A. No, sir. Q. Where was Jack Triplett when the shooting commenced? A. Right up there on the other side of the horses from Mr. Sanders. The horses were between him and Mr. Sanders. Q. What part of the horses was Triplett opposite? A. Up about the horse's head. Q. What did you do? A. I stayed there holding the lines until the horse was shot and killed. Q. Then where did you go? A. Went right back out through the hack and up the road. Q. Did you see John Etter? A. Yes, sir. I passed John Etter up there. Q. Know whether he had a gun at that time or not? A. I am pretty sure he had—had a gun in his hands as I passed him. Q. How far up the road was he then? A. I don't know. Probably 30 steps up the road from the hack. Q. What did you do next then? A. I went on down north of Mr. Finley's house and went across the railroad track and went on into town. Q. What county and state was that in? A. Rogers county, state of Oklahoma. Q. That is all."

Sheriff Sanders testified to the immediate facts in connection with the transaction as follows:

"A. We walked out to the section line and went down the road, I expect, a hundred yards from the gate, and we saw a wagon coming down the road, and when it got pretty close to us I told the driver to stop, that I wanted to see what was in the wagon. Q. What then occurred? A. And I got hold of the horse on the east side and stopped him, and Mr. Starr went around on the west side to the hind end of the wagon, and when he passed the wagon (the wagon was covered all over) I could not see him after he passed the front end, and pretty soon the

three men come back and passed the front end of the wagon, and I could see the tops of their heads and shoulders, and one said, 'Take him on down the road.' Q. Do you know who that was? Did you recognize the voice? A. Yes, sir. Q. Tell the jury. A. It was John Etter, and I didn't know the other man that went on down the road, and I could see Etter then. He had his hand raised in this position [indicating], and I said, 'John, drop that gun.' He said, 'Is that you, Ed?' I said, 'Yes'; and he took his arm down, and I stood there with my gun kind of pointed at him, and about that time there was a shot fired down the road, and I took my eye off of him, and I saw this fellow coming back kind of stopped, and he run up right on the opposite side of the team where I was, and it looked to me like he was getting under the neck of the horses, and so I expected something to happen, and so I got ready, and we commenced shooting about that time. I was shooting right under the horses' necks, and I guess he commenced shooting about the same time. I don't know which fired first. Q. Was either of you or the man you were shooting at wounded? A. Yes, sir. I was shot in the arm. Q. Did you afterwards see the bullet taken from your arm? A. Yes, sir. Q. Examine that and see if you can identify that bullet. A. That is the bullet taken from my arm. Q. Well, go ahead, and tell just what occurred. Now, you testified, I believe, that after you had this conversation with Mr. Etter your attention was directed to the shot fired down the road. A. Yes, sir. Q. When did you next see John Etter? A. Well, it was, I suppose, five or ten minutes later. Q. Did you see him while this fusilade of shooting was going on there? A. No, sir. Q. Do you know where he was at that time? A. No, sir. Q. Now, after the shooting was over between you and Triplett, what did you next do, Sheriff? A. Went around to the hind end of the wagon, and about that time Mr. Finley come up and wanted to know what the trouble was. Q. Go ahead. A. I told him we had a little shooting down there. I didn't know how bad it was, but that I was shot, and for him to come on down, and he and Etter then come on down to where I was at the wagon, and we went on down to where Starr was. Q. When Etter come to you, do you know whether he was armed or not at that time? A. Yes, sir. Q. Was he armed? A. Yes, sir; he was armed. Q. When did you next see him? A. I saw him right along then all the time, and we went on down to where Starr was laying. Q. What was Mr. Starr's condition? A. Why, he was dead. We turned around then, and I asked Etter for his gun. I asked him if he had a gun, and he said

he did, and I told him to give it to me, and he give me the gun, and I handed his gun to Mr. Finley. My arm was paining me considerable, and I give the gun to Mr. Finley. Q. Can you state what kind of a gun that was? A. It was a 32 Colts on about a 45 frame, looked to be. Q. Examine that gun and see if you can identify it.· A. Well, that is the same gun. Yes, sir. About the same kind of a gun, anyway. Q. If it is not the same gun, it is the same kind of gun? A. Yes, sir. Q. What was the condition of that gun with reference to being loaded? A. There were two empty chambers. Q. How many loads? A. Four loads in it. Q. What did you do with the gun after Finley come over and talked to you? What did you finally do with the gun? A. Brought it over here and give it to you. Q. Brought it to me? A. Yes, sir."

No evidence was introduced on behalf of the plaintiff in error. The evidence introduced by the state therefore stands uncontradicted. There are only two propositions argued in the brief of counsel for plaintiff in error.

First, counsel contend that the evidence introduced by the state does not support the conviction. This question was raised on a motion for a new trial, and it is contended that the court erred in denying the same on that ground. If the evidence introduced was such that a legitimate deduction of guilty could be drawn therefrom, then this court would not be justified in reversing a conviction on this ground; the trial court having approved the verdict by declining to disturb it. Beyond question the plaintiff in error and Triplett were engaged in the commission of a crime at the time the homicide occurred. The plaintiff in error appears to have been the prime mover in the transaction. It was he who procured the introduction of the whisky in violation of the laws of the United States. It was he who arranged for the team, and continued the unlawful asportation thereof after it had been brought into Oklahoma. It was he who directed Triplett to march the deceased down the road to where he was killed. After killing Starr, Triplett ran immediately back to where the sheriff had hold of the team, and a fusilade of shots were fired, in which the sheriff was wounded. It is clearly apparent that these violators of the law knew that they were being stopped by the officers. Both were armed. When

the plaintiff in error was arrested, a 32 caliber Colts pistol was taken from his person. One of the horses had been killed by a bullet of similar size. There were no empty shells in plaintiff in error's revolver, but ample opportunity had occurred for the ejection and disposition of shells, if there had been any. No one says this had not occurred.

The court instructed the jury that all persons assisting, aiding, and abetting in the commission of a crime were guilty as principals. We cannot say, from an examination of this record, that the jury were not warranted in finding the verdict of guilty. It was the exclusive province of the jury to say whether or not the evidence tending to establish the guilt of the plaintiff in error was so lacking in convincing force that it left no doubt in the minds of an intelligent and discriminating body as to the truth of the charge set forth in the information. In reviewing a proposition of this kind, this court will not disturb the findings of the jury, if there is any evidence which tends reasonably to support the verdict, even though different inferences could possibly or might probably be drawn therefrom. The jury's judgment on such question is final. We must be able to say that the verdict was clearly against the evidence. If not, it will be allowed to stand. There is no doubt from the evidence adduced that the plaintiff in error and Triplett had entered into a conspiracy to do an unlawful act, and at the time of the homicide they were carrying out that conspiracy, and, in order to protect themselves in their violation of the law, one officer was killed and another wounded by them. We are of opinion that the jury legitimately concluded that the plaintiff in error and Triplett were acting together in the murder, and that the judgment should not be interfered with. See *Holmes v. State,* 6 Okla. Cr. 541, 119 Pac. 430, 120 Pac. 300.

The only other proposition urged is that the court erred in sustaining the motion of the county attorney to strike in connection with a second effort to secure a change of venue. Counsel say in their brief that they are not inclined to insist that the court abused its discretion in refusing their first application. The compurgators supporting the application for a change

of venue were produced in open court, and their testimony incorporated in the record. We are of opinion that it was properly overruled. The second effort to procure a change of venue occurred five or six days later, when counsel asked leave to refile their original motion and attach thereto nine additional affidavits in support thereof. These proceedings the county attorney sought to have stricken from the record, and in this effort was sustained by the trial court. There was no showing made nor attempted to the effect that the public sentiment against the plaintiff in error had changed since the prior hearing, nor was there any allegation of surprise at the testimony given upon the hearing of the first application.

We are of opinion that the second proceedings were addressed to the sound discretion of the trial court, and, upon an examination of the record, find no abuse of discretion on the part of that court. In *Duckworth v. State,* 86 Ark. 357, 111 S. W. 268, the proposition here advanced was considered by the Supreme Court of Arkansas. In the opinion the court said:

"When the court overruled the petition for a change of venue, the defendant's attorney withdrew from the case and declined to have anything further to do with it. Other attorneys were selected by the defendant, and, after time given for consultation and preparation, the trial proceeded. The first step taken by these attorneys was the filing of a second petition for change of venue. It was to the same effect as the one theretofore passed upon, on the same day, and was supported by T. W. Carlock, W. R. Morrell, E. D. Hays, and Dennis Dailey. The latter three were not upon the former petition. The court declined to hear this petition, and overruled it without investigation. The statute (sections 2317, 2318, Kirby's Dig.) permits a defendant to file a petition for a change of venue when he believes, for the causes therein mentioned, that he cannot obtain a fair and impartial trial in that county, and it requires the petition to be supported by affidavits of at least two creditable persons, qualified electors and actual residents of the county, not related to the defendant in any way. There is nothing in the statute to indicate that a defendant is at liberty to continue filing petitions for a change of venue after one is acted upon. It might occur that an examination of the compurgators would develop that they had sworn recklessly, and yet the defendant

might still be entitled to a further opportunity of presenting his petition, but then he should show that he was surprised by the testimony of his compurgators failing to meet the requirements of the law and offer to bring in others who would sustain his position. In such instances it might occur that a defendant would be entitled to a further hearing on his petition, and it might be an abuse of discretion for the court to refuse to permit him to further prosecute his right to a hearing upon his petition for change of venue, when a strong showing was made indicating an injustice to him if further opportunity was not given. But no facts appeared entitling this defendant to a second hearing. The circuit judge carefully examined the witnesses, and found that they had failed to answer to the statutory requirement of being creditable persons in that they had sworn recklessly in this particular. The defendant then filed another petition supported by the affidavit of four persons (one of whom had just been examined and found wanting in information as to the matter under inquiry), without any showing of surprise over, or explanation of, the failure of his former compurgators to sustain their affidavits. In the absence of such showing, it was proper for the court to disregard such petition and treat it, as he did, as matter merely for vexation and delay."

In *Nichols v. State*, 102 Ark. 266, 143 S. W. 1071, the same court, discussing the same proposition, said:

"Allowing a defendant in a criminal prosecution to present successive petitions for a change of venue is a matter of discretion with the court, which will not be disturbed on appeal, unless abused; and, where a defendant failed to promptly announce his surprise at the incompetency of witnesses named in support of a petition, there was no abuse of discretion in overruling succeeding petitions."

Upon a careful review of this record, we are of opinion that the plaintiff in error had a fair and impartial trial. There is not an indication to the contrary.

The judgment is therefore affirmed.

DOYLE and FURMAN, JJ., concur.