## T. E. CLINGAN v. STATE.

No. A-3008.    Opinion Filed February 20, 1919.

(178 Pac. 486.)

1. **HOMICIDE—Manslaughter in the First Degree—Sufficiency of Evidence.** Evidence considered, and **held** sufficient to support a conviction for manslaughter in the first degree.

2. **APPEAL AND ERROR—Evidence—Review.** Where error is assigned based on the exclusion of proffered testimony by the defendant, and the brief of counsel for defendant (plaintiff in error) admits that the ruling of the trial court in excluding such evidence was correct, there is no contested question for decision by the appellate court.

3.  **EVIDENCE—"Res Gestae."** Spontaneous declarations springing out of and contemporaneous with the principal fact sought to be proven, and which are made at a time so near to it as to preclude the idea of deliberation and fabrication, whether they be declarations of a deceased or of a defendant or of bystanders, are admissible as part of the **"res gestae."**

4.  **APPEAL AND ERROR—Exclusion of Evidence—Materiality—Reversal.** The refusal to permit a witness for defendant to testify to a statement by defendant shortly after the difficulty, upon the ground that such statement was a self-serving declaration, will not be held to be sufficient ground for reversal where it is apparent that the theory of the defendant was fully, fairly, and impartially submitted to the jury, and such excluded evidence claimed to be part of the **res gestae** is only cumulative of other evidence admitted bearing upon defendant's frame of mind at the time of the fatal difficulty, and it is not likely that the evidence excluded would have changed the result.

5.  **TRIAL—Refusal of Requested Instructions.** It is not error to refuse requested instructions where the instructions given fully cover the law of the case in a manner not unfavorable to the defendant.

6.  **APPEAL AND ERROR — Reversal—Miscarriage of Justice.** Where it is apparent that the defendant has had a fair and impartial trial on a valid accusation which will support a conviction of the crime for which the jury found defendant guilty, and that the evidence and law in support of the defense interposed were fully, carefully, and clearly presented to the jury, this court will not reverse a judgment of conviction even in a closely contested case wherein the evidence is conflicting, unless it is made reasonably to appear that the errors complained of resulted in a miscarriage of justice or deprived the defendant of some constitutional or statutory right.

7.  **APPEAL AND ERROR—Conviction—Sufficiency of Evidence.** In view of Rev. Laws 1910, sec. 5873, limiting jury to questions of fact, and section 5905, relating to requisites of charge, the jury being the sole judges of facts, where there is sufficient evidence to reasonably support verdict, the Criminal Court of Appeals will not reverse a conviction.

*Appeal from District Court, Pushmataha County;*
*C. E. Dudley, Judge.*

T. E. Clingan was convicted of manslaughter in the first degree, and he appeals. Judgment affirmed.

*S. E. Welch*, for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen.; for the State.

MATSON, J. This appeal is from a conviction had in the district court of Pushmataha county, in which the plaintiff in error was charged with the murder of N. T. Horton, on or about the 29th day of February, 1916, and found guilty of manslaughter in the first degree. On November 24, 1916, the court, in accordance with the verdict of the jury, rendered judgment and sentenced the defendant to imprisonment in the penitentiary for a term of four years. On May 21, 1917, an appeal was perfected by filing in this court a petition in error with case-made attached.

The first error complained of is that the trial court erred in overruling the motion for new trial on account of the insufficiency of the evidence to sustain the verdict and judgment.

A substantial statement of the evidence is as follows:

The defendant, T. E. Clingan, was the principal of the Sugar Loaf school, located near Darwin, Okla. There were three rooms to this schoolhouse. The defendant taught in the main room of the building; the other teachers being Miss Kerr and Miss Oehler.

The deceased, N. T. Horton, had three daughters attending this school, the youngest of whom, Tommie, was in Miss Oehler's room. Some two weeks prior to the date of the difficulty, Miss Oehler had administered a whipping to Tommie, and from that time until the date of the difficulty, Tommie had not been able to attend school.

On the day of the difficulty, the deceased, who was somewhat under the influence of liquor, made two trips to the schoolhouse. The first time he went to the defendant's room shortly after school had taken up in the afternoon,

and asked defendant if he knew that his little girl had been sick ever since she had received the whipping two weeks before, and inquired what he should do about it. Defendant advised him, to go to court with it. Deceased then received permission from the defendant to take his two other daughters home with him, which he did.

A short time later, during the afternoon recess, the deceased again came to the schoolhouse. In the school-yard, before he entered the building, he had a conversation with one of the pupils in which he stated that he had come to see Miss Oehler, the teacher who had given his daughter the whipping. He went into the room in which the defendant taught. Defendant was at that time helping one Nellie Hager solve a problem in arithmetic. They were sitting at the first desk in the center of the room. Deceased walked up to where they were, and placed his left hand on the desk in a leaning position. He asked defendant if he had said that "that thing (referring to Miss Oehler) didn't give my little girl 39 licks," and when defendant denied making such statement, deceased repeated it. Defendant then told deceased that he did not want to have any trouble with him, and rose from the seat, passing very close to the deceased, and went back to the stove, some five or six feet distant. When he reached the stove, defendant picked up a wooden club which had been used for a poker, which was three or four feet long. Deceased had followed the defendant down to the stove, and was standing within two or three feet of him. A number of pupils had gathered around, and the son of the defendant was standing between the defendant and the deceased talk-ing to the deceased. The defendant, upon turning around after he had picked up the poker, said, "Stand back, boys," or, "Stand back, please," and immediately struck the de-

ceased across the head with the poker, and in so doing, according to one witness, he also struck his son, who was a larger man than the deceased, on the shoulder. The deceased, Horton, never regained consciousness, and died two or three days later from the effects of the blow.

The defendant claims that the deceased had an open knife in his overcoat pocket, and was holding same, with his right hand just above the pocket, leaving the blade of the knife in the pocket. Defendant's son also claims to have seen the knife when the deceased first came into the room the second time. However, none of the other witnesses saw the knife until after the deceased had fallen on the floor. The knife was found then with the point of the blade sticking in the overcoat pocket, the handle being a few inches from the right hand of the deceased. The deceased made no demonstrations with the knife, however, and the conversation above detailed was all that was heard by any of the witnesses except the defendant and his son. The deceased was standing still, apparently listening to what the defendant's son had to say, when he was struck. Some of the witnesses testified that the defendant took a step toward the deceased just before striking him.

There are some conflicts in the evidence. Mr. Rich, one of the school directors, a witness for the defendant, testified that deceased, on his way to visit the schoolhouse the second time, had a conversation with witness, in which the deceased told him that he (deceased) was going "to get the defendant, and that he had just sharpened his knife in preparation for the affray." However, one Mack, who was also present at the time of this alleged conversation, denied that any such threats were made by the deceased.

The defendant admitted that he had been convicted of manslaughter in the state of Arkansas.

Under the state's evidence, we think the defendant was at least guilty of manslaughter in the first degree, and the jury being the sole judges of the facts, where there is sufficient evidence to reasonably support the verdict, this court will not reverse a judgment of conviction. Sections 5873 and 5905, Rev. Laws 1910; *Love v. State,* 12 Okla. Cr. 1, 150 Pac. 913; *Smith v. State,* 12 Okla. Cr. 25, 151 Pac. 694; *Etter v. State,* 11 Okla. Cr. 208, 144 Pac. 560; *Davis v. State,* 10 Okla. Cr. 169, 135 Pac. 438; and many others. Therefore, we deem this assignment of error without substantial merit.

Another assignment of error relied upon for reversal relates to the refusal of the trial court to permit the defendant to prove by the witness Miss Elva Oehler, a teacher in the school, who had previously given a whipping to deceased's daughter, Tommie Horton, that such whipping was neither unusual nor the cause of the child's illness. It is argued in this connection that, because the court erroneously permitted the state to prove by Tommie Horton that Miss Oehler had whipped her about two weeks before this difficulty, it was very prejudicial for the court to exclude, under the circumstances, Miss Oehler's testimony regarding such whipping, because Tommie Horton had testified that she had been sick after she received that whipping. Counsel admit in the brief filed in behalf of the defendant that all the evidence relative to the whipping of the child was incompetent, irrelevant, and immaterial. It is not contended, therefore, that the ruling of the trial court was incorrect in excluding the proffered testimony of Miss Oehler.

The admission in the brief of counsel that this evidence was entirely incompetent and immaterial renders it unnecessary for the court to cite authority to that effect. It is apparent that the trial court did right in excluding any evidence which tended only to open an avenue of investigation into an immaterial matter, and also the opinion of the witness as to whether the whipping was unusual or the cause of the child's sickness was equally incompetent. The ruling of the trial court excluding such proffered testimony was correct.

In his third assignment of error defendant contends that the court erred in refusing to admit the testimony of the witness Miss Oehler in regard to a statement alleged to have been made by the defendant to her just after the blow had been struck. The record on this matter is as follows:

"Q. You heard a noise, you say? A. Yes, sir.

"Q. What did you do? A. I stood there by the door until I heard the man fall, and then I opened the door and went in the other room, in the room where he was; yes, sir.

"Q. When you went into the room, what did you observe? A. I observed Mr. Horton lying on the floor, and Mr. Clingan standing erect by the body.

"Q. And whereabouts was Mr. Horton lying? A. Well, he was lying in the middle aisle, east of the stove, with his head opposite the front side of the row of desks, you know.

"Q. And where were his feet lying? A. His feet were west.

"Q. Which was nearer the stove, his head or feet? A. His feet were.

"Q. About how far were they from the stove? A. Oh, not more than two feet, I don't suppose. I didn't notice the distance closely.

"Q. Did you see any weapons of any kind in there at that time? A. Yes; when I went in, I did.

"Q. All right; state what it was. A. The first word that was spoken when I went into the room—

"By Mr. Utterback: Wait a minute. We object, if the court please.

"By Mr. S. E. Webb: That was a statement made by Mr. Clingan immediately after the tragedy, and as such—

"By Mr. C. A. Welch: We think it is entirely incompetent what he said.

"By the Court (to counsel): Just come here a moment. (At this time the court and counsel confer out of the hearing of the jury and court reporter.)

"By Mr. S. E. Webb: Q. All right, go on and state what was first said when you entered the room. A. When I heard the falling of the body, I opened the door between my room and the principal's room, and entered the room used by Mr. Clingan, and the man was lying on the floor, and Mr. Clingan was standing by him, and he said to me, 'Miss Oehler, there was what he was trying to kill me with,' and he pointed to the man's body, and the knife was lying by his side.

"By Mr. Utterback: Now, if the court please, we move to exclude that statement.

"By the Court: It will be sustained, and the jury are instructed to disregard it. (Excepted to by defendant.)"

In this connection defendant contends that this statement was a part of the *res gestae,* and should not have been excluded from the consideration of the jury, because it tended to show the motive of the defendant.

Heretofore it has been said by this court that —

"What constitutes *res gestae* is possibly the most complex and difficult question in criminal law." *(Price v. State,* 1 Okla. Cr. 364, 98 Pac. 450.)

It has also been said that courts may only deal with the subject in the light of the facts of each particular case when the occasion arises. *Carnes v. State,* 14 Okla. Cr. 585, 179 Pac. 475.

Spontaneous declarations springing out of and contemporaneous with the principal fact sought to be proven, and which are made at a time so near to it as to preclude the idea of deliberation and fabrication, whether they be the declarations of the deceased or of the defendant, are generally considered to be admissible as part of the *res gestae.* It is necessary to consider in this connection whether the refusal of the trial court to admit this declaration was prejudicial under the circumstances in this case. This evidence tended solely to explain the condition of mind of the defendant at the time and immediately after the fatal difficulty. The defense interposed was self-defense, and it was competent and proper for the defendant to show by one of his witnesses, who was present immediately following the difficulty, that the defendant had declared upon seeing such witness, "There was what (pointing to the knife) he was trying to kill me with," provided such declaration was spontaneous and explanatory of the principal fact so as to amount in reality to a verbal act. An examination of the record in this case indicates to this court that it would perhaps have been better for the trial court to have admitted this tesimony in view of the fact that there was some doubt as to the admissibility of the defendant's exclamation or declaration on the ground that it constituted and was a part of the *res gestae.* The question presented is one difficult of correct decision, but this court is not given authority to reverse a judgment of conviction merely because the trial court may have committed error against the defendant.

Under section 6005, Rev. Laws 1910, it is incumbent upon this court to say in its opinion:

"That after an examination of the entire record, it appears that the error complained of has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."

The evidence which was excluded was cumulative, because it was already in evidence before the jury that the defendant, at the time he struck the blow which resulted in th death of deceased, did so, according to his testimony and that of his son, who was present at the time, for the reason that the deceased was advancing upon him with an open knife, and threatening to kill him with it. All the witnesses who were present at the time of the difficulty testified also that an open penknife was found partially concealed in deceased's right overcoat pocket, and that his right hand was resting close to the handle of this knife after he (deceased) had fallen to the floor. There was very little controversy, therefore, about the fact of the deceased having an open penknife in his pocket at the time he was struck.

The court instructed the jury fully upon the right of the defendant to defend himself against an unlawful attack by the deceased, even to the extent of taking life if necessary to that end. The defendant received the full benefit of this theory in the instructions given to the jury. It is impossible for anybody to read this record and not reach the conclusion that the theory of the defendant was fully and ably presented to the jury, and that the jury was not in any way misled in that there was any misunderstanding as to the right of the defendant to protect himself against an unlawful attack by the deceased with a knife, and also that the defendant advanced as a defense

that he in good faith believed he was in danger of such an attack at the time of the killing. This theory having been fully presented to the jury, and the evidence excluded being purely cumulative thereof, we fail to see wherein defendant could have been injured by its exclusion.

There were two distinct theories in this case, both fully presented to the jury by the court's instructions: The theory of the state that the killing must have been the result of heat of passion, that the act was perpetrated in a cruel and unusual manner, and by means of a dangerous weapon, which would make the defendant guilty of manslaughter; and the other, the theory of the defendant, while admitting the delivery of the blow that resulted in the death of the deceased, contending that he was acting to protect himself from an impending attack by the deceased with a knife, which would have entitled him to an acquittal. Either theory is supported by some evidence and it was the province of the jury to reconcile this evidence, and determine, if possible, which theory was true and which untrue. The jury having accepted the theory of the state, and there being ample evidence to support same, we are not authorized to reverse this judgment merely because all of the evidence which might have been competent to support the defendant's theory was not afforded the jury, especially where that excluded was entirely cumulative of that introduced.

Therefore it cannot be said that the rejection of this testimony by the trial court resulted in a miscarriage of justice, or prejudiced the substantial rights of the defendant, and, under the provisions of the foregoing statute, we are not at liberty to reverse this judgment of conviction on that ground. *Addington v. State*, 8 Okla. Cr. 704, 130 Pac. 311.

The fourth and fifth assignments of error relate to the refusal of the trial court to give certain requested instructions covering the defendant's right to defend himself. It is admitted that:

"We take no exception to the instructions of the learned trial court in this case. We think they are excellent as general instructions, and that they were altogether fair to this defendant as such, and as far as they went, but it was the duty of the trial court to have instructed the jury as to all of the law applicable to this case, to the testimony, and to the theory of the defense, and more especially after the defendant specifically requested the giving of five special instructions which we have just presented in this brief, and, as we view the law, the court should cover such matters in his general instructions.

"We take the view and we urge that each of the five requested instructions should have been given to the jury, but if the form of the same or any one of the same was objected to by the court, then the substance of said instructions should have been given to the jury as the law applicable to this case with reference to each and every one of the matters mentioned and set out in the five requested instructions."

Counsel for defendant assert that the trial court did not fully cover the law applicable to the defense interposed, but fail to point out wherein the court's instructions are unfavorable or lacking in respect to presenting the law of self-defense. Not a single exception was taken to any instruction given. We have carefully examined the charge of the trial court, and consider it one of the ablest and fairest expositions of the law applicable to the evidence that has ever been presented to this court in any appealed case. The law contained in the instructions requested by counsel for the defendant was fully covered in the instructions given, and in a manner very favorable to the defend-

ant. It was not error, therefore, for the trial court to refuse to give the requested instructions, because covered by those given. *Ryan v. State*, 8 Okla. Cr. 623, 129 Pac. 685.

We have carefully examined the record in this case, and, while it was a closely contested case on the facts, it is impossible to say that the defendant did not have that fair and impartial trial which is guaranteed to him under the Constitution and laws of this state. Under the state's theory, and the evidence in support thereof, he was guilty of manslaughter in the first degree. The jury accepted this theory as true, and rejected the theory of the defendant, also supported by evidence, that the killing was in his necessary self-defense.

This court is not at liberty to substitute its judgment on questions of fact for that of the jury, especially where the record is as free from error as is this. Defendant had the benefit of able counsel, and the evidence and law in support of his defense were fully, carefully, and clearly presented to the jury at every step throughout the trial. The trial court, after having seen all the witnesses, and heard their testimony, overruled the motion for a new trial, being, no doubt, convinced that the verdict was good and the proper one under the evidence.

For the reasons stated, the judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.