## JEFF BRIMMAGE v. STATE.

No. A-3084—Opinion Filed Feb. 21, 1920.

(187 Pac. 497.)

(Syllabus.)

1. **APPEAL AND ERROR—Conviction—Sufficiency of Evidence.**
If there is a clear conflict in the evidence, or if the evidence is such that different inferences may reasonably be drawn therefrom, the jury's determination will not be interfered with on appeal, unless the verdict is clearly against the weight of the evidence, or was influenced by passion and prejudice. It is not for this court to substitute its judgment on the question of the weight of the evidence for that either of the jury or the trial court, provided there is competent evidence from which the jury were authorized to reasonably conclude that the defendant was guilty of the crime charged.

2. **LARCENY—Evidence—Sufficiency.** Record examined, and held evidence sufficient to sustain the conviction.

*Appeal from District Court, Haskell County;*
*W. H. Brown, Judge.*

Jeff Brimmage was convicted of the crime of larceny of live stock and he appeals. Judgment affirmed.

*A. L. Beckett,* for plaintiff in error.

*S. P. Freeling,* Atty. Gen., and *R. McMillan,* Asst. Atty. Gen., for the State.

MATSON, J. This is an appeal from the district court of Haskell county, wherein the defendant was convicted of the crime of larceny of live stock, and sentenced to serve a term of 3 years' imprisonment in the state penitentiary.

The only question raised in this appeal relates solely to the sufficiency of the evidence to sustain the conviction. The Attorney General has incorporated in his brief a synopsis of the testimony of the witnesses, which fairly states the material evidence in the case, and is as follows:

"Walter Boyd, prosecuting witness, who says: In the year 1915 I lived over on Sam Howard's place near Tamaha, and I was farming. I know the defendant, and then lived about three-fourths of a mile from him. About June that year one of my yearlings left home. It was kind of reddish or yellow yearling heifer with no brands or marks. It was between four and five months old, and was at that time a sucking calf. We were keeping the cows up in a pasture while we turned the calves outside, and this animal ranged on the outside, failed to come up, and we got to hunting for her. We had two calves out that day, and one of them came back home, but I didn't find the other one for a long time. Mr. Horton told me where it was, or sent me word through Mr. Allen, and I went over and found it at Mr. Brimmage's house on the outside there of his pasture gate. I had hunted around his place when it was gone, and I had asked him twice about it, and he said he hadn't seen it, and I hunted all around his place, and upon the mountains there, but couldn't find it. I looked through all the cattle around there, but I didn't go in his pasture. It was inclosed with a net wire fence, and I never thought of a yearling crawling through a net wire fence; besides, his pasture was pretty thickety with bushes and blackberry briers. I found the yearling in there about the 1st of August, and it had disappeared the June before. When I found it it had no marks or brands on it, and I took it back home and put it in my pasture. Nobody claimed it, but I learned on the outside that defendant had sold this animal to Sam Stansel. Defendant asked me something about it the day or two before the first trial, which was in November last, I think, and then he asked me where it was. It was not taken from me with my consent, and just dis-

appeared without my knowledge. In this conversation he had with me he said, "There is a mistake somewhere about that yearling,' but he didn't say anybody was claiming it. He asked me to go with him and show him the yearling; not quite that either, he asked me where it was, and it was late in the evening, and a bad cold day, and I told him it was three or four miles from town, and that I didn't have time to go with him then. I also told him it was in Sam Howard's pasture, but I couldn't say exactly where it was. I didn't care for him seeing the yearling at all, and told him it was too cold to go with him that day. I don't say it was taken from me, but I say it was off the range for a good time, and then came back on the range. The reason I know she was off the range was because I couldn't find her, and I admit that it was in three-fourths of a mile of my place, and on the outside at the time I found her. I never saw it in his pasture, or know, personally, of him having anything to do with it.

"Sam Stansel: I know Jeff Brimmage and Walter Boyd, and know of Boyd's losing a yearling about June, 1915. I bought a yearling that is supposed to have been Boyd's, a pale yellow—some would call it a pale red or yellow—and I bought it from defendant Jeff Brimmage. When I bought it it was there in a pasture near Jeff's home, and he showed it to me. I taken it to be about a year old. He had two other sucking calves in there at the time with this yearling. There was no mark or brands on this pale red yearling, and Brimmage didn't tell me where he got it. I was living in about three-fourths of a mile from him at that time. The cattle he had at that time were two calves and two cows, all that I know of. I am a stockman, and know my neighbors' cattle. This yearling was a heifer, and when I talked to Brimmage I supposed it belonged to him and was all right. I bought other property in that contract, bought a mare, saddle, and this yearling all in one deal, I valued the yearling at $15 in the deal. I was on my way to Tamaha when I bought this property, and just left it there with him, and he said it

could stay there, and the purchase was made about the middle or latter part of August, 1915. The animal remained there a week. Then the defendant immediatly left the country, that is, he was absent, wasn't at home, and I went down to see something about the yearling. I don't remember when I first saw him after that; it must have been a year. I live only three-fourths of a mile from him, and pass his house every day or so, but it was a year before I saw him any more. I went down there to get the yearling in about a week afer I bought it, and asked Mrs. Brimmage. I never saw the yearling afterwards, nor have I seen the Boyd yearling, and I can't say what became of the yearling I bought from the defendant. It was supposed to be in the pasture. I never went to Boyd's place to hunt it —didn't think it would be of any use—thought I would have to replevy it, and would have to have Mr. Brimmage in the case, and Brimmage was gone, and so I made no effort to find it. I only asked about the yearling, asked Mr. Boyd and other parties. They described it to me, and it was the same kind that I had bought. After Jeff came back it was a couple of months before I saw him, I guess. He said he had sold me a yearling that belonged to him. I told him that Boyd claimed it, but I never went to see Boyd about it, because I had seen him already, and didn't think there was any need to see him again. Brimmage never paid the money back to me that I paid him for the yearling. I had filed the information in this case, and my neighbors didn't have anything to do with it. I didn't institute suit until about two months after he got back—file a complaint— that is, after I had learned he had come back, for he might have been back a good while before I knew it. But he disappeared in 1915, and I got to the sheriff's office in November, 1916. I never knew of defendant owning any cattle except the two calves and cows. I have been a farmer all my life, and have handled stock. I have never seen the animal I bought since Boyd got it in his possession. Not being able to identify a solid color yearling, I could't say whether or not the one Boyd got is the one Jeff sold me. I suppose he has been raising some

calves every year since he's been there—he has had milk cows and calves. He has had cattle, but I can't say what the descriptions were along. I have tried to tell the jury the truth, and have no reason to conceal any facts. I have talked with lots of people about this case, but I wasn't particular about getting evidence to stick defendant—I was only trying to find out the truth about it. I would not have brought this prosecution had pressure not been brought to bear upon me. I am not now trying to have defendant turned loose.

"Ben Merriman says: I live at Tamaha, and know Jeff Brimmage, and am his brother-in-law. I don't know the yearling in this controversy at all. I saw it, but didn't know whose it was; and when I saw it it was in Brimmage's pasture, a red yearling, or rather a light red. It looked to me like it was a year old past. I lived in about three-fourths mile of Jeff's home, and was there frequently. He was there a good deal of the time while the yearling was in the pasture. I don't know who owned the yearling while it was in the pasture. Jeff had two calves in there. He married my sister. He owned two milk cows and two calves, and that was all the cattle he had that I know of. I suppose during 1915 I was at his place every week; in fact I farmed on the same place. I don't know whether he claimed this yearling or not. All the cattle I know of were these two cows and 1915 calves, just two. He did not have any yearling at that time like this one. I have been acquainted with his property for 12 or 13 years. I have never talked to Jeff about this matter to amount to anything. He was gone during the year 1915, but I don't remember how long he stayed, and when he got back he was asking me about this yearling. He asked me if I remembered the yearling he had that run off or strayed off, or something, and I told him I did. I remembered a yearling that he used to own, and I didn't know what became of it. He was wanting to make me a witness, and I told him I didn't remember much about the yearling, and I didn't think I could do him any good in the case. I told

him I didn't think that this was the yearling, or something like that.  He still wanted me for a witness, and I told him if nothing else would do I would go, and I said to him something to the amount that the yearling in this case was not the yearling that had run off.  The one that ran off was a dark red in color, and that was in 1914—was the last time I saw it.  I never saw any yearling like this one around in 1915; besides, it would have been two years old instead of a yearling, and that one might have had some white on it, as I recollect.  His two calves the cows had for 1915. one of them was a male, a pale red; and the other was a mottled-face heifer, with some white about her. They were winter calves, and the yearling in this controversy was much larger, maybe 150 or 200 pounds bigger.  I don't remember about the horns, but if it had any they were short.  This one looked to me like it was a year old past.

"Walter Boys, recalled, says:  The calf I allege was stolen was born the 1st of September, 1914.  I stated a while ago that it was four or five months old when it strayed off, but I didn't say—in my statement a while ago, I didn't say how old it was when it went off, but I said the calf was four or five months old; I was talking about the calf.  I found this animal along about the first of August, between the first and the middle of the month, and it could not have been later than that, and I carried it home and put it in the field.

"Andrew Horton:  I know the defendant, knew him in 1915, and at that time lived a little better than half a mile from him.  I'm his brother-in-law.  I'm tolerable well acquainted with his stock and cattle.  While I never pay much attention to other people's stock I wouldn't be positive as to how many cattle he had in 1915, but I think he had four head—two cows and two calves.  I don't know the animal in controversy, though I have seen a red yearling there in the pasture.  I believe I saw it there in August.  And I have seen it around the place there.  In fact I don't know whether I noticed it much or not.  I don't

know that I ever knew of Brimmage owning a yearling like this unless he bought it, and I couldn't say whether he owned it or not.

"Will Allen: I know Jeff Brimmage, and in 1915 lived in three-fourths of a mile of him. I have seen the yearling in controversy. The first time I saw it it was on the outside, and that was along in August, 1915. I didn't know whose property it was. The next time I saw it it was in Brimmage's pasture, and the third time I saw it Mr. Boyd was driving it home—the same yearling. I never talked to Brimmage about it and don't know his stock.

"Here the state closed. The defendant demurred to the evidence, and asked an instructed verdict of not guilty, which was refused. Thereupon he introduced the following evidence in substance:

"Gala Johnson: I have lived near Tamaha 25 years, and know the defendant, and have known him for 25 years. In 1915 he lived about 3½ miles west of Tamaha, but I lived in the Osage country that year, part of the time. I was back in this section of country a week or so at the time in the summer of that year, and I was familiar with his place and its location—I won't be positive whether I was at his place that summer or not. I lived in his section in 1914. He had cattle over there then, and has had cattle ever since I knew him—he and his mother together. I cannot answer whether or not I was about his place in 1915. The cattle he owned in 1914 were a red stock of cattle, cows and calves. I have known his pasture ever since it was put in. There is no water in there part of the year, and I have been there time and again when the gate about his house and pasture was kept open as much as it was shut. I don't know what stock he claimed for the year 1914-1915.

"Van Johnson: I live at Tamaha, and know the defendant. He lived about 3½ miles west of there in 1915. I would pass his place during that year. I was farming in the neighborhood. He had some cows and calves to my

knowledge, and he had a small pasture there that I passed. I don't think there was any water in it. There is a little branch that runs through it, but I think it was dry; but I don't know whether that pasture was closed up that year or not.

"Jeff Brimmage, defendant, testified: I lived 3 miles west of Tamaha in 1915, and had lived there about 11 years, and that year Walter Boyd lived on Sam Howard's place, and ¾ of a mile from my house. I owned some cows and calves in 1914 and 1915. I sold a yearling to Sam Stansel in 1915, a red yearling, a heifer, with a white belly, and it was my yearling. It was calved in 1914, and was over a year old. I had raised it. I owned two other calves there at that time, 1915 calves. This yearling I sold Stansel was in my pasture, the pasture that joins my garden, right south of my house, when I sold it to Sam. There's 20 acres in that pasture there, and there is no stock water in it, and the pasture was open. My well didn't furnish water enough for my stock, and this pasture gate would stand open so the stock could go get water and come back. I don't know anything about Boyd's calf, but they had cattle that would come there and get in the pasture from the outside, and would come up and stand around there all night, sometimes a whole bunch of them. There were all sorts of cattle among them, calves, yearlings, steers, heifers, etc. I didn't know Boyd's calf at that time. After I was charged with stealing his calf I went to see about it —that was November, 1916, I believe. I went to get him to show him, or go to see if it was the one I sold Stansel, and he wouldn't go. I did sell Stansel a pale red yearling in 1915, and did so at home there in the pasture. I owned at that time six head of cattle, two cows, two calves, and two yearlings, and I had raised the yearlings. There were three cattle in the pasture when I sold this one to Stansel, that yearling and the two calves, and the balance of the cattle were on the outside. The mother of the calf I let him have is a white faced cow, and she was on the outside. The calves were not weaned at that time, and the

calves and cows were running together. This one I sold Stansel was a year old or over. I have a mark, an over-crop in one ear, and under-half in the other, but I hadn't marked this calf—just neglected it. I turned this un-marked, weaned calf on the range. Then I had another calf there, a dark red, and my folks marked it after I left in August, 1915. I came back along in July, 1916, I believe. I sold this animal to Stansel in August, about 10 days be-fore I left, along with some other property. I was not convicted of white slavery; I pleaded guilty. The assessor came along in January, 1915, and assessed my property. I don't remember whether I gave in my cattle as two head for that year or not. I have got three head of cattle now. The others died last winter. I have been married, but am not married now. I am not living with my wife. At the time I made this sale I had two cows with calves, and two yearlings from the same cow. When I took Stan-sel down there the pasture was open, and that was in August, 1915, and it was dry in there. I know Frank Prentiss, and this is my assessment list, but I don't re-member of him swearing me to it, and this list contains my writing. At the time I gave this list I say I have two milk cows, and I told the jury a while ago I had two cows and calves. That looks like my signature to it, but I don't know whether it is or not, but it looks like my signature. I can't say I didn't sign it.

"The assessment list returned by defendant in Feb-ruary, 1915, was then introduced in evidence, showing that at the time he returned for taxation only two head of cattle (cows). No yearlings or other cattle were listed by defendant at that time."

The jury is the exclusive trier of the facts in a crimi-nal case, and it has been repeatedly held by this court:

"If there is a clear conflict in the evidence, or if the evidence is such that different inferences may reasonably be drawn therefrom, the jury's determination will not be interfered with on appeal, unless the verdict is clearly

against the weight of the evidence, or was influenced by passion and prejudice." *Davis v. State,* 10 Okla. Cr. 169, 135 Pac. 438; *Calvert v. State,* 10 Okla. Cr. 185, 135 Pac. 737; *Magnetti v. State,* 13 Okla. Cr. 102, 162 Pac. 241; *Pace v. State,* 13 Okla. Cr. 580, 165 Pac. 1160; *Love v. State,* 12 Okla. Cr. 1, 150 Pac. 913.

The evidence in this case adduced by the state is sufficient, if believed by the jury, to authorize the conclusion that the defendant stole, as charged in the information, one light red yearling heifer, the property of Walter Boyd. The sufficiency of the evidence was raised in the lower court by motion to direct a verdict of not guilty at the conclusion of the state's evidence, and also as a ground for new trial, which motions the trial court overruled. The trial court and the jury had all the witnesses before them, and it is not for this court to substitute its judgment on the question of the weight of the evidence for that either of the jury or the trial court, provided there is competent evidence from which the jury was authorized to reasonably conclude that the defendant was guilty of the crime charged, and that the verdict was not the result of passion or prejudice.

We find no error of law presented by this appeal authorizing a reversal of this judgment.

The judgment of conviction is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.