## T. W. COOK et al. v. STATE.

No. A-4472.    Opinion Filed June 7, 1924.

(226 Pac. 595.)

(Syllabus.)

1.  **Evidence—When Hearsay Evidence Admissible as Part of the Res Gestae.** Hearsay evidence may be admissible as a part of the res gestae. One of the recognized exceptions to the rule that hearsay evidence is not admissible is where spontaneous statements or exclamations are made by an injured person, declaring the circumstances of the injury, where such statements are made immediately after the injury or during such indefinite time thereafter as the stress of pain, fear, or excitement prevents the reflective faculties of the narrator to control, so that the utterances are spontaneous and in direct response to the sensations produced by the physical shock or mental excitement. The utterances, to come within the exceptions to the rule, must be under the uncontrolled domination of the senses, so near in point of time that considerations of self-interest and reflection could not have been fully restored.

2.  **Same—Incidents as Told by Injured Person, 30 or 40 Minutes Thereafter, Inadmissible Except as Part of Res Gestae.** Evidence given by a third person concerning a recital of the incidents of a fatal assault made by the injured person in response to questions propounded to him by the witness at a different place, 30 or 40 minutes after the difficulty, where the answer made by the injured person indicates a purpose of identifying the perpetrators, is hearsay testimony, and is inadmissible, unless the statements were made under circumstances indicating a want of deliberation, or where the narrator's reasoning powers were suspended under stress of physical or mental shock or excitement.

3.  **Witnesses—Cross-Examination—Hostility of State's Witness.** The accused may, on cross-examination of a witness for the state, as affecting the credibility of such witness, show that the witness entertains ill feeling towards the accused and that the witness had recently assaulted and abused him.

Appeal from District Court, Pawnee County; Redmond S. Cole, Judge.

T. W. Cook and Alvis Fears were convicted of the crime of murder and sentenced to life imprisonment, and they appeal. Reversed and remanded as to defendant Cook, and dismissed as to defendant Fears.

J. M. Springer, for plaintiffs in error.

The Attorney General and G. B. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. The plaintiff in error T. W. Cook, here referred to as the defendant, appeals from a judgment and sentence of conviction rendered against him in the district court of Pawnee county on the 22d day of April, 1922, wherein he and Alvis Fears were found guilty of the murder of Harry Aurandt on the 18th day of December, 1921, and their punishment fixed as above stated. This cause originated in Tulsa county and was transferred to Pawnee county on application of defendants for a change of venue.

It has been made to appear to this court that Alvis Fears, codefendant with T. W. Cook, is and has been for some time a fugitive from justice, and the appeal as to Fears is therefore dismissed.

The facts surrounding this homicide, as recited in the record of the proceedings in the trial court, pertain not only to the occurrences at the scene of the fatal tragedy near Tulsa, but include also the subsequent flight of the alleged perpetrators; their apprehension and incarceration in jail; the incidental shooting of two innocent persons by peace officers at another place; and a robbery said to have been committed by the defendants at still another place, a story full of exciting situations, featuring bandits and officers with swift motor cars and high-powered firearms, and the rushing of ambulances and police squads to different places, in different directions, covering a period of from 8 o'clock p. m. to midnight of December 18, 1921.

It would be impractical to recite all the incidents contained in the record comprising more than 1,100 typewritten pages, but to intelligently treat the assignments of er-

ror relating to the admission and rejection of testimony an outline of the proof is set out as briefly as may be consistently done.

The only witness who testified to the details of the incidents leading up to the fatal gun battle resulting in the death of Harry Aurandt was Ike Wilkinson. He testified that he and Aurandt were police officers of the city of Tulsa, not on official duty on Sunday evening, December 18, 1921; that he and Aurandt left the home of the latter in Tulsa, in an automobile driven by Aurandt, about 7 o'clock that evening; that they drove south on the Peoria paved road, thence east about 6 miles, thence north on to the road known as Federal Drive, where they turned west in the direction of Tulsa; that as they were crossing a cross road at the corner of the Cy Avery farm they observed a car standing facing south; after proceeding a short distance past this other car the car in rear followed and passed the car occupied by Wilkinson and Aurandt, and as they passed Wilkinson and Aurandt observed three revolvers protruding from the curtains inclosing the car and heard a command, accompanied by oaths, to stop their car. In response to this command Wilkinson and Aurandt guided their car to the side of the paving and stopped; the car from which the command to stop had been given drove past them and stopped immediately in front of the car occupied by Wilkinson and Aurandt, at a place about 17 to 20 feet from where their car stood. The lights of Aurandt's car were on, so that the space around the car ahead was illuminated. Wilkinson says that Tom Cook, one of the defendants, was one of the occupants of the car which halted them, and that he was the first one to get out, followed by Alvis Fears, the other defendant, both with revolvers in their hands; that Cook fired a shot from his gun towards the car in the rear and then retreated about 30 feet west, in front of both cars, where he moved about on the

pavement from side to side; that Alvis Fears came back to near the front of the car occupied by Wilkinson and Aurandt and fired a shot from his revolver; that while this was going on Aurandt was preparing to get out of the car and did finally get out, when more shots were fired by Fears, one of which passed through the body of Aurandt, penetrating a lobe of the liver, passing through a part of his stomach, perforating the intestines and spleen; by another shot Aurandt was wounded in the left leg, about midway between the groin and the knee, the shot passing through the leg and out a little lower on the outside of the leg than at the point of entrance. While this was taking place Aurandt cried out, "Don't shoot me that way." Wilkinson, while preparing to alight, was severely wounded in the thigh and leg, which caused him to sink back into the car seat. During the drive preceding the shooting Wilkinson had a small bore shotgun, looking for rabbits to shoot as they drove along; during the affray he attempted to shoot at Fears with this shotgun, but the gun snapped and the shell failed to explode, and while he was in the act of trying to use the second barrel a shot from Fear's revolver knocked the gun out of Wilkinson's hands. After the shooting the bandits' car began to move and Fears and Cook got into their car and rapidly drove away, in the direction of Tulsa. As the car drove away Wilkinson, unable to move from his seat because of his wounds which caused him to be partially paralyzed, reached around the windshield and fired at random towards the fleeing bandits. Apparently none of these shots took effect. Aurandt, although fatally wounded, managed to get into his car and drive on west until they reached the first house, which was the residence of a Mr. Kennard, located about a half mile from the spot where the shooting occurred.

From the testimony of Wilkinson and other witnesses it appears that the wounded men stopped here and cried for

help. Receiving no immediate response Aurandt got out of the car and went to the front porch of the Kennard residence, where he again called for help and then fell on the porch exhausted. Mr. and Mrs. Kennard were about to retire for the night; they had heard the shooting, which occurred out of sight, over the hill from their place; they had also heard some commotion made by persons in a car which had passed in the road just a few moments before, going rapidly towards Tulsa, and which, after passing the intersection of the Skiatook road at that place, had suddenly stopped, backed up, and driven rapidly north on the Skiatook road towards Skiatook. The Kennards, not knowing the meaning of all that had occurred, did not instantly go to the relief of the wounded men. There were three or four neighbors near and Mr. Kennard went to them for help and Kennard and these neighbors came and carried Aurandt into the house and placed him on a cot, and also carried Wilkinson in and placed him in a chair.

In response to questions from some of these persons Wilkinson and Aurandt gave some description of the persons who had wounded them and stated that they knew who they were. One of the women there stated that Wilkinson in particular told who they were and said it was Tom Cook's gang. Upon receiving this information some of the party there phoned to police headquarters, giving the information they had received from the wounded men. Thereupon police squads were organized and sent out for the purpose of apprehending the bandits, and ambulances were dispatched to take the wounded men to the hospital. After the police officers arrived at the Kennard residence they were informed (according to their testimony) as to the identity of the parties who had done the shooting. This all took place sometime between 8 and 9 o'clock. At the time the wounded men were

taken into the Kennard home it was probably about 8:30, and the time of the actual shooting was probably about 15 or 20 minutes earlier.

One of the police squads hastily organized to search for the perpetrators of the shooting consisted of an officer of experience and four men deputized to accompany him and assist in the search. They proceeded in a high-powered automobile towards Skiatook and after driving 4 or 5 miles in that direction they saw and heard a car approaching at a rapid rate of speed; they stopped and parked their car partially across the pavement, and three of the party proceeded forward in the reflection of the spot light on the car, exhibited their official stars and waved their arms at the approaching car, calling out that they were officers and wanted the driver of the car to stop. Instead of doing so the driver increased his speed and apparently tried to run over the officers standing in the highway, and as the car sped past the officers shot at it. They then got in their own car, pursued and overtook the car that had just sped past them, ran ahead of them and stopped them. They then discovered that they had wounded a boy and a woman who had no connection with the shooting on Federal Drive. One of the party then proceeded with these wounded persons to the hospital, while the others turned and pursued their journey towards Skiatook. Presently another car approached rapidly, and the plan used in attempting to stop the first car was repeated, except that this time the officers parked their car directly across the road so as to obstruct passage.

The car stopped because of this obstruction, and the occupants were found to be Tom Cook, Alvis Fears, and Frank Shelton. The officers compelled these men to hold up their hands, alight from the car, and submit to search. The officers found on the persons of the men and in the car four

revolvers, some pocket knives, keys, ammunition, and other articles. On account of the inexperience of some of the officers it was feared that the defendants might attempt to escape, so they were compelled to lie prone upon the ground, face downwards, until another automobile came along, from which the officers procured some baling wire with which they tied the hands and wrists of the defendants securely behind their backs. They then proceeded to take the defendants to police headquarters in Tulsa, where they were lodged in jail. The guns, ammunition, and other articles found upon the defendants were also delivered at police headquarters.

The time at which the officers apprehended and arrested the defendants was about 11 o'clock. Among the articles found in defendants' possession were a gold-handled penknife, a pocket knife, a bunch of keys, and a package of mints. The evidence discloses that at about 10:30 o'clock that night, at a crossroad intersection about 6 miles from Skiatook, and about 18 or 19 miles from the scene of the fatal shooting on Federal Drive, these defendants held up a young man and a young lady at the point of guns and robbed them of this gold-handled penknife, pocket knife, bunch of keys, and a package of mints. This was at a point about 6 or 7 miles from the place where the defendants were arrested.

It was shown by oral testimony and by demonstrative evidence that one of the revolvers taken from defendants had a defective plunger pin that made a peculiar mark where it struck and exploded the cartridge, and also that this revolver was not exactly uniform in bore, so that a cartridge after being exploded contained a slight bulge, conforming to the defect in the bore of the gun. In searching about the place where the shooting occurred on Federal Drive, on the morning following, two cartridge shells were

found by one of the officers who had arrested the defendants the night before, which shells bore the marks of a defective plunger pin and also disclosed this peculiar bulge at a place corresponding to the defect in the bore of the pistol in question. These empty shells were introduced in evidence before the jury.

In this connection, it appears that the officer who claimed that these empty shells were found by him at the place of the shooting was the same officer who defendants claim abused them at the time of their arrest on the Skiatook road. Defendants claim that this empty shell evidence could have been placed there by this hostile witness, or by some other witness overly anxious to fasten the crime upon the defendants.

The defendants maintain that the police officers who testified for the state, including those who effected their arrest and the officers about the police station, were exceedingly hostile and prejudiced against the defendants. They offered on cross-examination of several officers to show that the officers who made the arrest knocked them down, stamped upon them and kicked them, struck them with their fists and that one of them cut a gash or scratch on the face of Tom Cook, and otherwise mistreated them in an effort to get them to confess that they were the persons who did the shooting on Federal Drive. Defendants offered further to show that after they were taken to the police station they were assaulted and beaten in an endeavor to force a confession. The court refused these proffers, which defendants claim was grievous, prejudicial error.

The defendants should have been accorded that right. It is always competent, as affecting the credibility of a witness, to show on cross-examination that he entertains ill

feelings towards the accused. If the officers did abuse the defendants by beating and otherwise mistreating them, such facts could be shown as indicating bias or hostile feeling towards the defendants.

The court also permitted the state, over the objections of defendants, to introduce several witnesses who testified to what Aurandt and Ike Wilkinson told them at the Kennard home, in response to inquiries made by different persons there as to who did the shooting, at times from 30 to 45 minutes after the shooting occurred. The court permitted these witnesses to testify to what these wounded men said concerning the shooting and who did it on the theory, apparently, that it was a part of the res gestae. Defendants say that the admission of this testimony was also prejudicial error.

The defendant introduced a number of witnesses to attack the general reputation for truth and veracity of Ike Wilkinson, the only eyewitness of the fatal shooting on Federal Drive. It was contended by defendants that witnesses who said that they knew the reputation of Ike Wilkinson for truth and veracity in Tulsa, and that that reputation was bad, were competent. The court held that the defendants should show that each character witness knew the reputation of Ike Wilkinson in the neighborhood where he lived,. confined to three or four, or a few, blocks from his residence. This we think was error, but this error was cured, for the most part at least, because in the course of the examination of these witnesses several were finally permitted to state that they knew his reputation for truth and veracity in Tulsa, and that it was bad. The testimony of some of these character witnesses was somewhat shaken on cross-examination.

It was shown that Ike Wilkinson had been for years a police officer in Tulsa. He may have had a city-wide reputation as a prevaricator, and it would be an unwarranted lim-

itation to confine the scope of the knowledge of his reputation to that particular part of the city where he at that time resided. If the state desired to test the claim of the character witnesses who said they knew his reputation for truthfulness throughout the city of Tulsa, they had a right to go into that feature on cross-examination. The evidence of the character witnesses who stated that they knew what Wilkinson's reputation for truthfulness was in Tulsa was admissible. The weight of the evidence so given was for the jury, and if it developed on cross-examination that the witness did not in fact know what that general reputation was, or that the reputation he had was equivocal and local, the jury would give his testimony such credence only as the facts might warrant.

After about an hour and a half had intervened between the time of the shooting on Federal Drive and the time the hospital attendants were preparing to place Aurandt on the operating table at the hospital, Aurandt said to the attending surgeon, just before the anesthetic was administered, "Doctor, this is awful," or "This is bad, isn't it?" To this question the surgeon replied, "Yes, Harry; this is very serious." Aurandt then said, "And only to think, the dirty sons of guns shot me with both hands in the air." The surgeon said, "Do you know who did it?" Aurandt nodded his head in the affirmative, but did not make any further answer, because some one else there present answered for him. The court permitted this testimony to go to the jury upon the theory that it was admissible as a dying declaration.

Considered in connection with all the other parts of the record, this testimony is not vitally important. We think, however, it was probably admissible as a dying declaration, to be given such weight as the jury might deem it entitled.

A man who had been shot through the body, with a number of vital organs penetrated, who was bleeding profusely, and some of whose intestines were protruding from his wounds, about to go upon the operating table, where the attending surgeon told the patient that his condition was "very serious," must have realized that death was impending.

At the Kennard home, while there awaiting the arrival of the ambulances, Wilkinson, in response to a question asked him by Ed McBride, "What shot you?" replied, "Tom Cook and a short little fellow. Cook had a scar on his face." Mrs. Gillespie, a neighbor there present, said to Aurandt, "It is a pity we don't know who did this," and in reply Aurandt gasped, "We saw, we saw; I know." A little later, after the officers came, in response to questions put by one of them, Mrs. Gillespie heard Wilkinson say, "Tom Cook's gang did it. Alvis Fears was one of them." Mrs. Gillespie testified further that Wilkinson said he would have blowed his (Fears') head off if the gun hadn't snapped. Mrs. Kennard said that as Aurandt lay on the porch he said, "Oh, lady, let me come in. I have been shot." Later Aurandt said that he was shot with his hands up. She heard Wilkinson tell a police officer that Cook was one of the men, that he had a scratch on his face. Mr. Kennard testified that Wilkinson said he knew who shot them; that one was Tom Cook; that he had a mark on his face; and that the other one was a little short fellow. A policeman there testified that Ike Wilkinson said that Tom Cook and Fears did it; that his shotgun snapped in Alvis Fears' face. Another policeman said that Ike said, "If the gun hadn't snapped I would have blown the head off of Alvis Fears," and that Tom Cook had a scratch on his face.

These were all statements made to the witnesses by the wounded men from 30 minutes to one hour after the shooting

on Federal Drive. These statements were testified to by the different parties who heard them when made, and these hearsay statements were admitted over the strenuous objections of defendants, upon the theory that they were a part of the res gestae.

One of the recognized exceptions to the rule that hearsay evidence is not admissible is where spontaneous statements or exclamations are made by an injured person, touching upon the circumstances of the injury, where such statements are made immediately after the injury or during such indefinite period of time thereafter as the stress of pain, fear, or excitement prevents the reflective faculties of the narrator to control, so that the utterances are spontaneous and in direct response to the sensations produced by the physical shock or mental excitement. The utterances, to come within the exceptions to the rule, must be under the uncontrolled domination of the senses, and so near in point of time that considerations of self-interest and reflection could not have been fully restored. Sections 1745, 1746, 1747, Wigmore on Evidence, vol. III.

The great mass of judicial opinions, many of them cited in the briefs, touching upon the length of time elapsing between the shock creating the excitement and the time the declaration is made, on account of the boundless variety of surrounding circumstances, afford no definite precedents to determine exactly what length of time will preclude the admission of statements as a part of the res gestae. The time must necessarily vary according to the circumstances of each particular case. The gist of the inquiry is: Were the exclamations made spontaneous, under stress of excitement precluding the reasoning faculties, self-interest, or design of the narrator? If the hearsay statement was a deliberate narra-

tion of a past event, it is inadmissible. Chapter 59, Wigmore on Evidence; section 510, Underhill's Criminal Evidence.

In this case the hearsay evidence admitted consisted of declarations made in response to questions of inquiring persons, some 30 minutes or more after the actual tragedy had ended, at a place more than a half mile distant, while the men who made the declarations were suffering intense pain from serious or mortal wounds. But the evidence shows that they had been able in the meantime to drive an automobile, to summon help, and with apparent deliberation they described the details of the battle. One of the wounded men, Ike Wilkinson, survived and testified at the trial, where he confirmed and enlarged upon what he had told the spectators at the Kennard home while waiting for the ambulance, indicating that the stress of excitement and suspension of reasoning powers had passed and that the declarations made to the Kennards and others there assembled, as testified to by them, were in fact a rational narrative of past incidents, and therefore not admissible as spontaneous declarations made under stress of excitement. These statements indicate a purpose and design of apprising those present of the identity of the perpetrators and of giving those present information that would aid in their apprehension. Neither can these declarations be considered as "verbal acts," as defined by Mr. Wigmore. Chapter 58, Wigmore on Evidence, and cases there cited.

The hearsay rule of evidence excludes extrajudicial utterances, not a part of the main transaction, when offered to prove the truth of matters asserted by witnesses at the trial. The evident purpose of the introduction of the statements made by these wounded men at the Kennard home was to establish the truth of the assertions made, and particularly

to corroborate and bolster up the testimony of Ike Wilkinson given at the trial, as establishing the identity of the accused. In this connection we must remember that the veracity of Ike Wilkinson was in some degree impeached, thus making the admission of hearsay corroboration exceedingly dangerous.

This and other records here show that these defendants have been implicated in the perpetration of other violent crimes. If it could be done without violence to established law and judicial precedent, we would like to stretch the blanket of "harmless error" to cover this case. But these defendants may not have been implicated in this particular crime. When the identity of the accused rests largely upon the testimony of a single witness whose veracity has been impeached, supported by hearsay evidence emanating from the same source, it would be establishing a dangerous precedent to hold the admission of such hearsay evidence harmless.

For this error, and for the error of the court in refusing to permit the defendants to impeach the credibility of the several officers who testified for the state by showing their hostility towards the defendants, the cause as to T. W. Cook is reversed and remanded for a new trial. The appeal as to Alvis Fears is dismissed.

MATSON, P. J., and DOYLE, J., concur.