## DONALD FRAZEE v. STATE.

No. A-10487.    Nov. 29, 1944.

(153 P. 2d 637.)

Jerome Sullivan, of Duncan, for plaintiff in error.

Randell S. Cobb, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

JONES, P. J.   The defendant, Donald Frazee, was charged in the district court of Comanche county with the crime of rape; was tried, convicted, and sentenced to serve ten years in the State Penitentiary, and has appealed.

At the time of the act complained of, the defendant was 16 years and 5 months of age.   It was contended by the state that the defendant and another youth, Billy Joe Pearce, committed rape by force on the person of one Ila Curry, the wife of an Army Lieutenant, stationed at Fort Sill, Okla.

The evidence, briefly stated, is as follows: Mrs. Curry testified that on August 26, 1943, about 3 p. m., she had laid down on her bed at her home at Lawton, Okla., to rest a few minutes; that she was fully dressed except that she had removed her shoes; that she was awakened by some-one on top of her with his hand over her mouth; that this person was Billy Joe Pearce; that he said, "Don't move your head, don't scream, or don't look at us or we'll kill you;" that she was pinned down to where she could not move; that Pearce committed an act of sexual intercourse with her at that time; that she jerked his hand off of her mouth and moved her head and saw the defendant Frazee standing by the bed.   That the defendant Frazee was

present during all of the time that Pearce was on her; that after Pearce had finished the act, the defendant Frazee likewise committed an act of sexual intercourse with her; that during the time Frazee was committing the act, Pearce kept admonishing her not to scream nor look at their faces nor say anything or they would kill her; that all of the threats were made by Pearce; that after the assault had been committed and as the boys were leaving the front door, she jumped out of the bedroom window, and, while still barefooted, ran to the next-door neighbor's house; that Mrs. Weist, the neighbor, was not at home, but that she used the telephone and called her at Mr. Weist's place of business. That after the police arrived, it was discovered that the two youths had made their entrance into the house by using a wire to unlatch a screen and entering through a window.

Mrs. Harry Weist testified that she lived next door to the house occupied by Lt. and Mrs. Curry; that about 4 o'clock p. m., on August 26, 1943, while the witness was at her husband's place of business, Mrs. Curry called and told her that two men had come in her house and raped her. That she went home immediately and found Mrs. Curry crying and in a hysterical condition; the witness then related what Mrs. Curry told her concerning the alleged rape, which story was substantially the same as that related by the prosecutrix in her testimony.

A. B. Boling, chief of police of the city of Lawton, testified that on August 26, 1943, he was called to the home of Lt. Curry. When he got there, around 4 p. m., Mrs. Curry was very nervous and highly excited. He searched the premises and found the back screen by the kitchen had been opened and was loose; that he obtained a description of the boys who were alleged to have made

the attack and arrested them about four hours later in the city of Lawton.

The defendant, Donald Frazee, testified in his own behalf that he was 16 years of age on March 8, 1943; that he weighed about 112 or 113 pounds; that he had previously enlisted in the Navy, but had been discharged when they found out his age; that on August 26th, he and Billy Joe Pearce had been to Fort Sill, looking for a job; that as they were returning home they passed the Curry house, and upon looking in saw a woman lying on the bed; that the Pearce boy said, "I imagine if she is asleep, her purse is around there some place;" that the Pearce boy tried the different windows and the back door, but that they were locked; that Pearce then took a piece of wire, stuck it through the screen and unlocked the screen; that Pearce climbed in the window, unlocked the back door and defendant went into the house with Pearce. The defendant stated that he found the purse, opened it and took $6 from the purse; that while he was going through the purse, Pearce went into the next room; that he went to the room where Pearce had gone and saw Pearce lifting a table upon which an electric fan had been placed; that Mrs. Curry woke up and said "Hey," and defendant ran out of the room; that when he got to the door, he looked around to see if Pearce was coming; that he waited at the door two or three minutes and then went back to the room to see what was detaining Pearce; that he saw the prosecutrix lying across the bed with Pearce on top of her with his hand on the side of her face; that he sat down in the southwest corner of the room and waited while Billy Joe Pearce and the prosecutrix committed an act of sexual intercourse; that when Billy Joe Pearce got off of the prosecutrix, he was still sitting on the chair; that Pearce walked over to the chair where he was sitting and he got

up and walked over to where the prosecutrix was lying; that he took hold of one leg of her pants and started to take it off and she lifted her leg so he could remove it, and then did the same with the other leg; he then related that he committed an act of sexual intercourse with the prosecutrix, that she offered no resistance while he was committing the act, and that she made no effort to get up or prevent him from committing the act. On cross-examination, the defendant admitted that the prosecutrix had her face turned to the wall while he was committing the act with her and that she kept her face turned that way because Billy Joe Pearce had told her to keep her head turned or he would kill her.

Mrs. Curry was recalled and testified that she did not place her arms around Billy Joe Pearce, nor the defendant, during the time they were committing the act with her and did not assist in removing the pants as testified by the defendant; that defendant was not sitting in a chair, but was standing by the bed while Pearce was committing the act, and that as quickly as Pearce got off, the defendant got on her, before she had time to move. She then testified in explaining a statement testified to by the defendant whereby the defendant stated that the prosecutrix had said, "Don't let anything happen," that she was about three months pregnant; that previously in January, she had had a miscarriage and that it was constantly going through her mind that the things that were happening might cause her to have another miscarriage.

It is first insisted that the trial court erred in overruling the demurrer to the information. There are several grounds set forth in the demurrer, but the one insisted upon by counsel for defendant is the contention that the

court did not have jurisdiction over the person of the defendant for the reason that the defendant had not been accorded a preliminary examination and was not represented by counsel at the preliminary examination as provided by law.

The record discloses that the preliminary complaint was filed before the county judge who acted as an examining magistrate at the preliminary examination.

Upon the hearing, in connection with this contention, the county judge testified that a preliminary examination was had before him on August 30, 1943; that the defendant was arraigned before him on August 27, 1943, at which time,

"The county attorney read the complaint to the boy and when the complaint was read, I explained to the boy his rights in the matter, that he had 24 hours in which to make up his mind what he wanted to do in the matter, and that he had right to consult some attorney if he wanted to and so they entered a plea of not guilty, I believe, or guilty, I don't remember what the record will show there, anyway, we had a preliminary, and they entered a plea of not guilty, because they had a preliminary. Q. Did he in response to your advising him of his rights express any desire to employ counsel? A. He didn't. Q. Coming to the date of the preliminary hearing held before you on August 30, 1943, at that time, I will ask you whether or not you recall, to begin, the information, the complaint wasn't read by the county attorney of this case? A. It was, yes, sir. Q. In open court? A. Yes, sir. Q. Who was present, if anyone, with the defendant, Donald Frazee, at the counsel table? A. His father. Q. In open court, did you, or did you not advise the boy again, and his father of right to counsel? A. I asked Mr. Frazee, the father, if he was going to have counsel, and he said if I would permit he would represent the boy himself in court, and I granted that request. Q. And pursuant to the permission

granted was the father and the defendant Donald Frazee both granted the right of cross-examination in that hearing? A. They were. Every witness was put on the stand he was asked if, I asked the father that was representing the boy if he had any questions that he wanted to ask. Q. And he did ask certain questions? A. He did ask some questions. Q. On the evidence adduced by the state at such hearing you found the probable commission of the crime and the reasonable belief that this defendant did commit it and bound him and transcribed him to the district court? A. I did, yes, sir."

One cross-examination, the county judge testified that at the time of the preliminary examination, the father did most of the talking for the son; that he knew the father of the defendant was able to employ counsel, but that the father said he wanted to see into the case further and would handle it himself during the preliminary and later would hire an attorney if he thought it necessary.

The county attorney also testified that the defendant upon his arraignment before the committing magistrate and later, the defendant and his father both being present, were advised of all of defendant's rights, including his right to be represented by counsel, but that no request was made to the court to appoint counsel, but, on the contrary, it was stated by the father of the defendant that they did not desire counsel for the preliminary hearing. No other proof was introduced by either the state or the defendant.

A demurrer is not the proper pleading to challenge any defects in the preliminary proceedings prior to the filing of the information in the district court. A motion to quash or set aside the information is the proper remedy. However, all parties concerned treated the demurrer herein as being sufficient to raise the question as to whether a

preliminary examination in accordance with the law had been accorded the defendant.

Article 2, sec. 20, Oklahoma Constitution, provides among other things that the accused "shall have the right to be heard by himself and counsel. . ." In considering this constitutional provision, it has been held that the right to be heard by counsel is in the nature of a personal privilege which the accused may waive. Starr v. State, 5 Okla. Cr. 440, 115 P. 356; In re Tuggle, 70 Okla. Cr. 83, 104 P. 2d 726.

In the case of Lyons v. State, 77 Okla. Cr. 197, 138 P. 2d 142, this court held that the mere fact that a defendant did not have counsel appointed to defend him at a preliminary examination was not a denial of his constitutional right to be heard by counsel where he had able counsel to defend him at his trial, and ample time and opportunity had been given to prepare for the trial.

We can perceive of instances where an accused is young and illiterate and wholly incapable of preparing his defense or conducting an examination, where the court should assign counsel to represent him as a necessary prerequisite of due process of law, whether requested or not. But such are not the facts in the instant case. No showing made by defendant and his father that they were unable to employ counsel, but, on the contrary, the showing by the state was that the father was able to employ counsel but stated that he did not desire to have counsel at the preliminary examination. Under such a record, the court properly overruled the demurrer.

It is contended that the court erred in allowing Mrs. Weist to relate statements made to her by the prosecutrix after the alleged crime had been committed.

234

In this connection, the prosecutrix testified that when she heard the defendant and his companion opening the front door to leave she jumped from her bed and went through a window and ran to her neighbor's house and called Mrs. Weist over the telephone. The witness, Mrs. Harry Weist, testified that the prosecutrix told her over the telephone that two men came into her house and raped her; that the witness drove home immediately and found the prosecutrix at her house, barefooted, crying, and in a hysterical condition; that the prosecutrix again related about the two boys coming into her house and raping her; that she said one of the boys held his hand over her mouth and that they threatened her.

The rule concerning the admissibility of hearsay evidence as a part of the res gestae is well stated in the case of Cook v. State, 27 Okla. Cr. 215, 226 P. 595, as follows:

"Hearsay evidence may be admissible as a part of the res gestæ. One of the recognized exceptions to the rule that hearsay evidence is not admissible is where spontaneous statements or exclamations are made by an injured person, declaring the circumstances of the injury, where such statements are made immediately after the injury or during such indefinite time thereafter as the stress of pain, fear, or excitement prevents the reflective faculties of the narrator to control, so that the utterances are spontaneous and in direct response to the sensations produced by the physical shock or mental excitement. The utterances to come within the exceptions to the rule, must be under the uncontrolled domination of the senses, so near in point of time that considerations of self-interest and reflection could not have been fully restored."

See, also, Dodd v. State, 29 Okla. Cr. 311, 233 P. 503; Morehead v. State, 12 Okla. Cr. 62, 151 P. 1183, Ann. Cas. 1918C, 416; Clingan v. State, 15 Okla. Cr. 483, 178 P. 486; Chastain v. State, 46 Okla. Cr. 123, 287 P. 826.

In Chastain v. State, supra, it is stated:

"No fixed measure of time or distance from the main occurrence can be established as a rule to determine what should be a part of the res gestæ. Each case must necessarily depend upon its own circumstances to establish whether the facts offered were a part of the same continuous transaction."

It follows from the above decisions that when hearsay evidence is offered on the theory that it was a part of the res gestae that it first becomes a question for the trial court to determine after a consideration of all of the facts and circumstances surrounding the giving of the statement. It might be said that it is a matter within the discretion of the trial court, and the trial court's ruling will be upheld on appeal unless there appears an abuse of discretion.

Here we find the prosecutrix just a few minutes after the alleged attack occurred in such a physical condition from the shock of the assault made upon her that her utterances were spontaneous and created by and springing from the attack made upon her, and made so soon after the alleged attack in such a manner as to preclude the idea of deliberation and falsification.

It is next contended that there is a fatal variance between the allegations in the information and the proof introduced at the trial.

The information charges the defendant with the crime of rape "by means of force overcoming her resistance." The defendant contends that the proof of the state showed that defendant committed the crime "by threats of immediate and great bodily harm, accompanied by apparent power of execution," and would come under the provisions of subdivision 5, section 1111, 21 O.S. 1941.

The proof of the state was sufficient to authorize the county attorney to allege in his information rape by force or rape by threats of immediate great bodily harm accompanied by apparent power of execution.

The prosecutrix testified that she was awakened by Billy Joe Pearce being on top of her and holding her down with her head pushed toward the wall and with his hand on her mouth. That she was pinned down to where she was unable to move. This was sufficient to substantiate the allegations of the information.

The defendant, through his counsel, prepared and submitted a complete set of instructions to the trial court and saved exceptions to the refusal of the court to give these instructions. Defendant now contends that the court erred in refusing to give certain instructions requested by him. Most of these instructions were based upon the theory that the defendant was guilty of the crime of rape in the first degree or nothing at all. Defendant's counsel says that where rape by force is committed, it is rape in the first degree regardless of the age of defendant.

21 O. S. 1941 § 1114 defines rape in the first degree and is as follows:

"Rape committed by a male over eighteen years of age upon a female under the age of fourteen years, or incapable through lunacy or unsoundness of mind of giving legal consent; or accomplished with any female by means of force overcoming her resistance, or by means of threats of immediate and great bodily harm, accompanied by apparent power of execution, preventing such resistance, is rape in the first degree."

Under this statute, no male under the age of 18 can ever be guilty of rape in the first degree. It is apparent

from this statute that the lawmakers intended to place youths over 18 in a classification separate and apart from those under 18. Defendant was only 16 years of age. The trial court correctly construed this statute and instructed the jury that if they found the defendant guilty of rape by means of force and violence overcoming her resistance and that the female was over 14 and the male under 18, that it would only be rape in the second degree.

The defendant further requested an instruction as follows:

"You are instructed, gentlemen of the jury, that it is the duty of each and every member of the jury in this case to decide the issues presented for himself, and, if, after consideration of all the evidence in the case and the instructions of the court on the law, and from consultation with his fellow jurors, there is a single juror who has a reasonable doubt of defendant's guilt, it is his duty under his oath, to stand by his conviction and favor his verdict of not guilty, so long as he entertains such doubt.

"Included in court's
"Instructions and Refused.
"Exceptions allowed.

"Toby Morris,<br>"Judge."

This court has never had occasion to pass upon this precise question. The defendant in support of his contention that the court erred in refusing to give this instruction cites Mitchell v. State, 129 Ala. 23, 30 So. 348; Green v. State, 168 Ala. 104, 53 So. 284; People v. Dole, 122 Cal. 486, 55 P. 581, 68 Am. St. Rep. 50; Easter v. State, 191 Miss. 651, 4 So. 2d 227, 137 A. L. R. 391; State v. Wisman, 94 W. Va. 224, 118 S. E. 139.

Easter v. State, supra, is reported in 137 A. L. R.

391, together with an annotation of the decisions of other states on this question.

It is the duty of jurors to reason together and harmonize their discordant views where possible. A juror should not consent to a verdict which he thinks is contrary to the evidence out of a mere deference to his fellow jurors. Yet, he may consider whether the doubt which he entertains is a reasonable one which makes no impression on the minds of others equally honest and equally intelligent with himself, who have heard the testimony out of which the doubt arises, and he may properly change his views because of this consideration. In other words, he can properly doubt the correctness of his own opinion when it is not concurred in by his fellow jurors, and may without a violation of his oath, consent to a verdict, which he, if he were acting alone, would not render.

While the court might have, in his discretion, given the requested instruction, yet, his refusal to do so is not error. The majority of the decided cases so hold. Such instruction undoubtedly has a tendency to appeal to an obstinate juror, and the jury room is no place for pride of opinion or obstinancy for the reason that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other and with an open mind toward the views of their fellow jurors.

It is possible as suggested by counsel in his brief that a failure to give such an instruction causes many jurors to be subjected to the will of one or two strong characters after they have retired to the jury room. However, it appears that such an instruction is an invitation to the jury to disagree. We have provided by statute that when a verdict is rendered, the jury may be polled on requirement of either party. 22 O. S. 1941 § 921. This statute

should protect a defendant if he has cause to believe in his own mind that the verdict was not the unanimous vote of the jury.

In Egan v. United States, 55 App. D. C. 306, 5 F. 2d 267, 268, it is stated:

"The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that a verdict shall represent his opinion of the case at that moment, or that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

Many courts have held that a requested instruction, such as the one herein under discussion, without pointing out in such instruction the duty of each juror to consult with his fellow jurors is properly refused since it has a tendency to impress upon the mind of each juror the idea that his verdict must be reached and adhered to without the aid of that consultation and deliberation which the law contemplates shall take place in the jury room and constitutes an invitation to cause a mistrial. 137 A.L.R. 404; Shepard v. United States, 10 Cir., 160 F. 584, certiorari denied 212 U. S. 571, 29 S. Ct. 682, 53 L. Ed. 655; Smith v. State, 25 Ala. App. 445, 148 So. 336 (which cases overrule the Alabama cases which are cited in support of the defendant's contention and holds that such instructions are bad). Biddle v. State, 131 Ark. 537, 199 S. W. 913; People v. McNabb, 63 Cal. App. 755, 219 P. 1028; State v. Boyles, 34 Idaho, 283, 200 P. 125; State v. Godwin, 131 Wash. 591, 230 P. 831; Sims v. Commonwealth, 134 Va.

736, 115 S. E. 382; State v. Shaw, 59 Utah 536, 205 P. 339; People v. Lardner, 296 Ill. 190, 129 N. E. 697; State v. Clouse, 113 Kan. 288, 214 P. 103.

In the instant case, the trial court gave the instruction generally used by the trial courts in Oklahoma that the verdict must be by concurrence of all twelve of the jurors but did not stress the point defendant makes that each juror should stand by his conviction. The instruction given was a sufficient declaration of the law on the subject.

It is further contended that the defendant was materially prejudiced by reason of the county attorney's asking the defendant on cross-examination if he and Billy Joe Pearce were tried and convicted in the juvenile court and sent to the reformatory, and it is, also, insisted that the defendant was materially prejudiced by reason of certain misconduct of Lieutenant Curry, the husband of the prosecutrix, which occurred in the presence of the jury and during the argument of counsel for defendant.

We shall consider these two assignments of error with the contention of defendant that the punishment assessed the defendant is excessive.

When the county attorney asked the defendant on cross-examination if he and his companion had not been tried and convicted in the juvenile court, counsel for the defendant immediately interposed an objection which was sustained by the trial court in the following language:

"By the Court: Sustained. Gentlemen, you are instructed that the question asked was not competent and you will not consider it for any purpose whatsoever."

In 10 O. S. 1941 § 101, which is the procedural statute pertaining to dependent and delinquent children, it is provided:

"A disposition of any child under this Article or any evidence given in such cause, shall not in any civil, criminal or other cause or proceedings whatever in any court be lawful or proper evidence against such child for any purpose whatever, except in subsequent cases against the same child under this Article."

In view of this statute, the trial court properly sustained the objection to the question asked by the prosecutor. In should not have been asked. In Coppage v. State, 77 Okla. Cr. 413, 142 P. 2d 371, this court held:

"Questions may be asked in the presence of the jury, which convey to them information which is so prejudicial to the rights of the defendant that, notwithstanding an objection is sustained thereto, it may constitute reversible error. The whole record may be examined to determine this."

The Legislature of this state took cognizance of the fact that many children do things which they would not do if they were of more mature age and judgment, and provided in the above statute that their misconduct which might have caused them to have been committed as a delinquent child could not be used against them for any purpose in any proceeding in any court.

In the hearing on the motion for new trial, counsel for defendant made a showing that during the argument of one of the counsel for defendant that Lieutenant Curry, the husband of the prosecuting witness, who had sat at the counsel table during most of the trial but did not testify, arose from his seat in the middle of the courtroom and walked down the aisle toward counsel for defendant in a belligerent manner and was restrained by the sheriff of Comanche county and ordered to be seated. The trial court in commenting upon this situation at the time of the overruling of the motion for new trial stated:

"The court observed the lieutenant immediately after he stood up from where he was first sitting and observed him coming down the aisle toward the west. The court immediately began to observe to see whether or not any peace officers were observing the situation, and saw that they were. It only lasted about 30 seconds, the whole situation, the way the court observed it. The jury had been listening and listening attentively to argument for both sides, and was listening attentively to the argument of Mr. Paul Sullivan who was arguing at the time, but Mr. Paul Sullivan, the way the court viewed it, did pause in his arguments and look toward the lieutenant. The court is not prepared to say for a certainty that all of the members of the jury observed it, as the court was observing carefully the lieutenant, and was not particularly looking toward the jury, but was observing the lieutenant and the attorney, Paul Sullivan. The court kept his eyes on the lieutenant almost exclusively until after he was seated. So, the court didn't observe particularly whether the jury saw him, or not, and couldn't say for a certainty at this time.

"By Mr. Sullivan: Q. Will Your Honor state whether, or not, there was a tenseness in the courtroom during that time? By the Court: Yes, I would say there was some tension created by the incident. It was very brief, and I would say it wasn't pungent or unusual, lasting only a few seconds. It was apparent to the court that the lieutenant had no weapons of any kind upon a close observation of him, I watched him carefully and saw that the peace officers had the thing well in hand. If there was any purpose in his mind, the court couldn't say from his actions that there was any purpose other than the fact that the court suggested that it apparently had the tenor or action of a belligerent situation on his part, but there really was nothing actually that the court could see that caused him to form that opinion other than the situation of the trial itself."

Such an unusual situation presented a problem to the trial court and likewise to this court on appeal. The

actions of the lieutenant might have prejudiced the jury against the defendant or it might have aided the defendant by reason of the fact that the jury knew that counsel for defendant in presenting his argument was presenting the cause of his client in the light of the evidence most favorable to the defendant. This counsel had the legal obligation to do.

However, in viewing the question as to whether or not the jury assessed excessive punishment under all of the record, we have given the defendant the benefit of the doubt concerning the improper question of the county attorney concerning defendant's conviction as a juvenile, and this alleged misconduct of Lieutenant Curry. Furthermore, it must be considered, also, that this defendant, although a little older than his accomplice, Billy Joe Pearce, was in every other way his inferior. Pearce weighed about 155 pounds, the defendant 112 pounds. Pearce admittedly took the lead in all of the acts. He first suggested that they go into the house to steal the purse. It was Pearce who first attacked Mrs. Curry. According to Mrs. Curry's testimony, it was Pearce who used the force and threats against her and it was the defendant who stood beside her bed and gave acquiescence to the acts. The defendant never at any time made any threats toward the prosecutrix, and if it were not for the fact that he stood by and acquiesced in the force used by Pearce and the threats made by Pearce and then committed the act himself while Pearce used the force and threats during defendant's act, the conviction could not stand as to this defendant.

In view of all of this record, it is our opinion that the judgment and sentence assessed against the defendant is excessive and should be modified from a sentence of

ten years in the State Penitentiary to a sentence of five years in the State Penitentiary.

It is therefore ordered that the judgment and sentence of the district court of Comanche county be modified by reducing the sentence imposed against defendant from ten years in the State Penitentiary to a term of five years in the State Penitentiary, and judgment and sentence as thus modified, is affirmed.

BAREFOOT, J., concurs. DOYLE, J., not participating.