William J. B. SEVIER, Plaintiff in Error,

v.

STATE of Oklahoma, Defendant in Error.

No. A-12874.

Court of Criminal Appeals of Oklahoma.

Sept. 28, 1960.

Hardin Ballard, Thomas G. Smith, Purcell, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

NIX, Judge.

William J. B. Sevier, hereinafter referred to as the defendant, was charged by information in the District Court of McClain County with the crime of murder. He was tried before a jury, found guilty of manslaughter in the first degree and sentenced to twelve (12) years in the Oklahoma State Penitentiary.

Defendant appeals to this Court upon numerous assignments of error. However, the discussion herein shall be confined to assignments numbers 2 and 3 which the court considers error of such consequence as to be deemed reversible error.

The contention of the defendant as to these assertions of error involved the testimony of witness Billy Jack Harper and Dr. W. C. Long. A condensation of the facts, as presented by the record reveals that defendant was charged with the murder of his 85 year old father. It is alleged in the information that murder was consummated in the following manner:

"* * * that is to say the defendant William J. B. Sevier did, in said county and state, on the day and year aforesaid, unlawfully, wilfully, wrongfully and feloniously, without authority of law and with a premeditated design to effect the death of one John Frank Sevier, make an assault in and upon the said John Frank Sevier, with a smoothing iron then and there had and held in the hands of him the said William J. B. Sevier, and did then and there with the said smoothing iron so had and held as aforesaid, unlawfully, wilfully, wrongfully and feloniously

and without authority of law and with a premeditated design to effect the death of the said John Frank Sevier, strike, beat, bruise, wound and injure the body and person of the said John Frank Sevier with the said smoothing iron and thereby inflicting certain mortal wounds in and upon the head and body of the said John Frank Sevier of which said mortal wounds so inflicted as aforesaid the said John Frank Sevier, did on the 24th day of June 1959, die as was intended * * *."

The evidence reveals that the deceased expired four days after the altercation from a stroke which the state contends resulted from a brain clot produced by the blows administered by the defendant.

The altercation which took place on June 20, 1959 was witnessed by Mrs. Loney Ellen Sevier, the wife of the deceased. She was physically unable to appear at the trial in district court, but testified at the preliminary hearing. Her testimony was recorded, transcribed, and read at the district court trial. Her testimony was in substance that the defendant, her son, came home between 6 or 7 o'clock on June 20, in a drunken condition. That she and her husband were sitting in the living room and that the defendant 'boxed him'—the testimony was as follows:

"Q. Would you tell the Court exactly what happened when he came to the house? A. Well he come in drunk.

"Q. Where were you and your husband? A. Sitting in the living room.

"Q. What happened then? A. He boxed him.

"Q. Now when you say he, who was that? A. That was William J. B. Sevier—hit him.

"Q. Hit him, hit who? A. His father.

"Q. John Frank Sevier? A. John Frank Sevier.

"Q. How long after he entered the room did that happen? A. That was right when he first came in.

"Q. He just walked in and—A. He was just crazy drunk is what I would call it.

"Q. And he hit his father? A. Yes sir.

"Q. What happened? A. I don't really know what happened. I was all tore up myself, it had me all scared to death.

"Q. Well, did he do anything else to his father?

* * * * * *

"A. I didn't see nothing, I ran outdoors and got a hoe and brought it in.

"Q. What were they doing when you left to go get the hoe? A. Well he was still a boxing papa, his father.

"Q. And where were they when you left to go get the hoe? A. They were both in the living room.

"Q. All right, and you said you ran outdoors to get the hoe, is that right? A. Yes, sir.

* * * * * *

"Q. Where did you have to go to get it? A. Around at the back.

"Q. Around at the back of the house? A. Yes sir.

"Q. Was it dark or light? A. It wasn't too dark.

"Q. It was still kind of light, is that right? A. Yes, uh-huh.

"Q. Did you find a hoe? A. Yes sir.

"Q. And then what did you do? A. Brought it in the house.

"Q. Did you go back in the—A. No, it had kinda quietened down.

"Q. Did you go back in the front? A. Yeah, I went back in the front.

"Q. So you went clear around the house, is that right? A. That's right.
* * * "

Defense counsel points out that there is no testimony from the only eye witness as to the use of a smoothing iron or any other weapon but merely that defendant boxed

the deceased. She testified as to the injuries as follows:

"Q. Was he injured? A. I couldn't tell you that. I guess he was. It looked like it. There was three little places upon his head.

"Q. Did he have any places on his head before William J. B. Sevier came to the house? A. No sir."

The testimony about which defendant complains upon the grounds of hearsay and which he claims was inadmissible was that of Billy Jack Harper. He testified that about 9:30 deceased and his wife came to his home, about a half mile from where the altercation occurred. They had come to use the telephone. Mr. Harper's telephone was out of order and he took them to a phone. The testimony as to this incident was as follows:

"Q. Did Mr. Sevier, now just answer this yes or no. Did Mr. Sevier tell you anything that happened or what had happened, prior to that time? A. Yes.

"Q. Did you ask him any questions about it? A. Yes.

"Q. How did the conversation first start? A. Oh, I don't remember, my wife talked to them first and they told her, said, had some trouble up at the house, told my wife that.

"Q. Where was this?

"By Mr. Ballard. I want to object to what they say he told his wife as irrelevant, incompetent, and immaterial and also, as not responsive to the question.

"By the Court. Sustained.

"Q. Did Mr. Sevier ever tell you anything prior to your getting in the car with him? A. No, not directly to me.

"Q. Did he say anything about what had happened where you could hear it? A. Yes.

"Q. But after he got in the car did he tell you anything, too? A. Yes.

"Q. Well now what was the circumstances, did you ask him a question about it or did he just start talking about it? A. Not at first.

"Q. What happened, tell us how he started? A. (Witness nods head affirmatively.)

"Q. I mean, don't say what he said but did he just start talking about it or what happened?

"By the Court. You tell us what happened. A. Well, he just started talking, telling me about it. But you said not to tell what he said.

"Q. That's what I mean, he just blurted out with it, is that right? A. Yes.

"Q. Where were you at this time? A. In my car.

"Q. Where was the car? A. In the driveway.

"Q. Were you preparing to do something? A. Yes, I was backing out.

"Q. And where was Mr. Sevier? A. In the front seat.

"Q. And where was Mrs. Sevier? A. Settin' beside him.

"Q. How long after they had arrived at your house was this? A. Oh, five or ten minutes.

"Q. A short period of time? A. A very short time.

"Q. What did Mr. Sevier tell you?

"By Mr. Ballard. Now wait, before I object, I would like permission to ask two or three questions of the witness.

"By the Court. The County Attorney has no objections, go ahead.

"Questions by Mr. Ballard. Q. This was, I believe you said, 9:30 or later? A. Yes.

"Q. And the information which you say that John Frank Sevier gave you or the statements he made to you about this accident happening, was that in response to some question from you

—did you make some inquiry about what the matter was or what had happened? A. Yes, I believe I did, I don't remember the words.

"Q. You don't remember the words but you did make some inquiry as to what the matter was or what had happened and it was in response to your ·question, then, that he gave you this statement as to what did happen, is that right? A. Yes, I think so.

"Q. Now, the defendant here, William J. B. Sevier, was he present at that time? A. No sir, he wasn't.

\* \* \* \* \* \*

"Q. Mr. Harper, I want it clear now, to the Jury and the Court, when you were in the car, did you ask a question first or did Mr. Sevier just start telling you what happened? A. I believe I asked about it first.

"Q. Well now when did you decide this, that you asked about it ·first?

\* \* \* \* \* \*

"Q. Will you tell the jury exactly what the conversation was now don't ·tell what Mrs. Sevier said but what Mr. Sevier told you. A. Well, he said the boy had came in drunk and beat him up.

"Q. Did he say what boy? A. Yes, he did later, he said J. B.

"Q. And he said the boy—I didn't hear you too well, what did he say? A. He said he came in drunk and beat him up.

"Q. All right, what else did he say? A. Well, after we got in the car he said that the boy had hit him with a piece of iron.

"Q. The same boy? A. Yes. \* \* \*"

Cross-Examination:

"By Mr. Ballard. Q. Just a minute, Harper, did Mr. Sevier, that is, the old gentlemen, did he ask his wife what it was that the boy hit him with? A. Yes.

"Q. In other words, he didn't know himself, he didn't say that he had been hit with a piece of iron, he asked his wife what it was. A. He said that the boy hit him with a piece of iron. And I said 'What kind a piece of iron?' and he said, 'I don't know', and turned around to his wife and says, 'Mama, do you know?' and she says, 'No, I don't know.'

"Q. Now did Mr. Sevier, that is, the old gentlemen, did he appear to be all right to you? A. Well, I couldn't tell because I never did see him in the light.

"Q. But he ·talked all right? A. Well, he was at that time.

"Q. Completely rational? A. Yes, although he did act excited.

"Q. He was excited but then he didn't appear to be out of his mind .or anything? A. No."

Mr. Harper's testimony as. to the injuries was as follows:

"Q. Did you examine Mr. Sevier's head at all? A. Yes, I did.

"Q. Would you tell the jury what you saw? A. Well he taken my hand and told me to feel of the back of his head.

"Q. And what did it feel like? A. Well, he had two knots on the back of his head.

"Q. Did you see any blood? A. No, I didn't but I never did actually see him in the light either."

On cross-examination:

"Q. Harper, you felt these knots on his head? A. Yes.

"Q. Did you put your hand up there? A. Yes.

"Q. Did you have any blood on your hand? A. No.

"Q. There must not have been any blood then, was there? A. I don't think so."

To this line of testimony the defendant offered vigorous objections which were

overruled and exceptions allowed. Defendant objected upon the grounds that the statements were made out of defendant's presence. That said statements were not spontaneous but in answer to questions propounded and rather than a spontaneous statement was a narration of events made by the deceased.

■ Mr. Harper's recitation of the conversation with the deceased comes clearly within the general rule rendering hearsay testimony inadmissible. Hearsay, as defined by previous authorities and as related in 20 Am.Jur. 408, § 454, is evidence which derives its value, not solely from the credit to be given to the witness upon the stand, but in part from veracity and competency of some other person.

The exclusion of hearsay testimony is based upon solid ground and adds strength to our system of jurisprudence. Hearsay testimony is not subjected to the tests which can ordinarily be applied for the ascertainment of the truth of testimony. Hearsay testimony is one made without sanction of oath and without defendant being under a responsibility to answer for the crime of perjury in making a wilful falsification and is free from cross-examination. See 20 Am.Jur. 401.

■ There can be no question but what the testimony complained of was hearsay in its rankest form. The trial judge in overruling defendant's objection to the admission of the testimony did not state his reasons nor relate the grounds upon which he based his ruling. The state in their brief attempts to justify the court's ruling by claiming that the conversation between the deceased and the witness was part of the res gestae. With this contention we cannot agree. The conversation producing this testimony occurred some two and a half hours after the altercation. According to the state's witness it was not spontaneous but extracted by the propounding of inquiry. Though the term "res gestae" is almost indefinable there are certain prerequisites necessary in identifying testimony as part of the res

gestae. These requirements are well founded and constitute the basis for the admission of declaration under the res gestae rule. It may well be conceded in all jurisdictions that res gestae declaration must be spontaneously and instinctively made at the time of a specific transaction or event without the opportunity for formulation of statements favorable to one's own cause are likely made without opportunity of fabrication or falsification. It is to be noted in the case at bar that the deceased and his wife walked approximately a half mile to a neighbor's house and according to the testimony, arrived there about two to two and a half hours after the altercation. The declarations in question were made about 5 or 10 minutes after arrival and were made in answer to inquiry.

This court in passing upon the question, laid down the rule in the case of Cook v. State, 27 Okl.Cr, 215, 226 P. 595:

* * * before a statement made by one deceased may be considered as a part of res gestae, it must have occurred at or near the time of the occurrence of the event, it must have been spontaneously made and must have been provoked by the happenings of the event itself so as to become a part thereof. If made in relating a past occurrence or events it is inadmissible.

Defendant in his brief cites a case very much in point: Fenimore v. State, Okl.Cr. App., 169 P.2d 214, 215, wherein the Court said:

"A statement, if part of res gestae, is admissible, but if time is such as to give opportunity for fabrication or falsification, statement is inadmissible as part of 'res gestae.' * * *

"The sheriff then drove to the town of Comanche, arriving there at about 4:30 a. m. It is evident that more than an hour had elapsed since the time of the alleged assault and counsel for defendant contended that more than two hours had elapsed. The sheriff talked to the prosecutrix at her home

in the presence of her relatives. The sheriff was allowed to detail, over the vigorous protest of counsel for defendant, the various things related to him in that conversation by the prosecutrix, including the details of the alleged attacks by Ralph McCullom, the defendant."

This testimony was declared hearsay by this opinion and at page 218 it is stated:

"This court has stated that where hearsay evidence has been received which reasonably contributed to the verdict of guilt, the reception of such evidence is ground for reversal."

■ No doubt this testimony contributed to defendant's conviction as it was the only testimony (with the exception of Mr. W. D. Lang) that suggested the use of a weapon including that of the only eye witness. In this connection Dr. W. G. Lang testified that some unidentified person stated to him that deceased had been struck with a smoothing iron. His testimony was as follows:

"Q. As a physician attending him, did you take the history of the cause of his injuries? A. From the family?

"Q. Yes. A. I did. From the family, not the patient.

"Q. What history did you have to go on to treat the injuries in—

"By Mr. Ballard. Now wait a minute, I want to object to any testimony as to any history which the doctor got from any one other than the deceased. Certainly it would be incompetent, irrelevant and immaterial, any statement someone else made to the doctor about the condition of the deceased would be the rankest hearsay. (Whereupon, counsel approached the bench to confer with the Court outside the record and hearing of the jury).

"By The Court: Overruled, exception allowed. A. The history given me by the family was that he had involved in a fight two days prior and he had sustained a stomping, was the word used, to the abdomen and blows to the head with a smoothing iron. That was the history given."

This testimony is likewise hearsay and though the court admonished the jury to consider it only for a limited purpose it constituted an evidentiary harpoon that could not be easily wiped from the jury's minds by the court's admonition.

This was not only hearsay but the declaration was purportedly made by an unidentified person who could very easily have been the renowned and much proclaimed one-eyed individual who hangs out in front of the post office.

The admissibility of the doctor's testimony and that of witness Harper compels reversal of this case. The judgment and sentence of the trial court is therefore reversed and the cause remanded to the district court of McClain County to be retried in conformance with this decision.

POWELL, P. J., and BRETT, J., concur.